## ANDERSON *v.* CREIGHTON ET AL.

No. 85–1520.   Argued February 23, 1987—Decided June 25, 1987

636

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, BLACKMUN, POWELL, and O'CONNOR, JJ., joined. STEVENS, J., filed a dissenting opinion, in which BRENNAN and MAR-SHALL, JJ., joined, p. 647.

*Andrew J. Pincus* argued the cause for petitioner. With him on the briefs were *Solicitor General Fried, Assistant Attorney General Willard, Deputy Solicitor General Ayer, Barbara L. Herwig,* and *Richard A. Olderman.*

*John P. Sheehy* argued the cause *pro hac vice* for respondents. With him on the brief was *Ronald I. Meshbesher.*\*

JUSTICE SCALIA delivered the opinion of the Court.

The question presented is whether a federal law enforcement officer who participates in a search that violates the Fourth Amendment may be held personally liable for money

---

\**David Rudovsky, Jack D. Novik,* and *Michael Avery* filed a brief for the American Civil Liberties Union as *amicus curiae* urging affirmance.

damages if a reasonable officer could have believed that the search comported with the Fourth Amendment.

## I

Petitioner Russell Anderson is an agent of the Federal Bureau of Investigation. On November 11, 1983, Anderson and other state and federal law enforcement officers conducted a warrantless search of the home of respondents, the Creighton family. The search was conducted because Anderson believed that Vadaain Dixon, a man suspected of a bank robbery committed earlier that day, might be found there. He was not.

The Creightons later filed suit against Anderson in a Minnesota state court, asserting among other things a claim for money damages under the Fourth Amendment, see *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388 (1971).[1] After removing the suit to Federal District Court, Anderson filed a motion to dismiss or for summary judgment, arguing that the *Bivens* claim was barred by Anderson's qualified immunity from civil damages liability. See *Harlow* v. *Fitzgerald*, 457 U. S. 800 (1982). Before any discovery took place, the District Court granted summary judgment on the ground that the search was lawful, holding that the undisputed facts revealed that Anderson had had probable cause to search the Creighton's home and that his failure to obtain a warrant was justified by the presence of exigent circumstances. App. to Pet. for Cert. 23a–25a.

The Creightons appealed to the Court of Appeals for the Eighth Circuit, which reversed. *Creighton* v. *St. Paul*, 766 F. 2d 1269 (1985). The Court of Appeals held that the issue of the lawfulness of the search could not properly be decided on summary judgment, because unresolved factual disputes

---

[1] The Creightons also named other defendants and advanced various other claims against both Anderson and the other defendants. Only the *Bivens* claim against Anderson remains at issue in this case, however.

made it impossible to determine as a matter of law that the warrantless search had been supported by probable cause and exigent circumstances. *Id.*, at 1272–1276. The Court of Appeals also held that Anderson was not entitled to summary judgment on qualified immunity grounds, since the right Anderson was alleged to have violated—the right of persons to be protected from warrantless searches of their home unless the searching officers have probable cause and there are exigent circumstances—was clearly established. *Ibid.*

Anderson filed a petition for certiorari, arguing that the Court of Appeals erred by refusing to consider his argument that he was entitled to summary judgment on qualified immunity grounds if he could establish as a matter of law that a reasonable officer could have believed the search to be lawful. We granted the petition, 478 U. S. 1003 (1986), to consider that important question.

## II

When government officials abuse their offices, "action[s] for damages may offer the only realistic avenue for vindication of constitutional guarantees." *Harlow* v. *Fitzgerald*, 457 U. S., at 814. On the other hand, permitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties. *Ibid.* Our cases have accommodated these conflicting concerns by generally providing government officials performing discretionary functions with a qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated. See, *e. g.*, *Malley* v. *Briggs*, 475 U. S. 335, 341 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law"); *id.*, at 344–345 (police officers applying for warrants are immune if a

reasonable officer could have believed that there was probable cause to support the application); *Mitchell* v. *Forsyth,* 472 U. S. 511, 528 (1985) (officials are immune unless "the law clearly proscribed the actions" they took); *Davis* v. *Scherer,* 468 U. S. 183, 191 (1984); *id.,* at 198 (BRENNAN, J., concurring in part and dissenting in part); *Harlow* v. *Fitzgerald, supra,* at 819. Cf., *e. g., Procunier* v. *Navarette,* 434 U. S. 555, 562 (1978). Somewhat more concretely, whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the "objective legal reasonableness" of the action, *Harlow,* 457 U. S., at 819, assessed in light of the legal rules that were "clearly established" at the time it was taken, *id.,* at 818.

The operation of this standard, however, depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow.* Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights. *Harlow* would be transformed from a guarantee of immunity into a rule of pleading. Such an approach, in sum, would destroy "the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties," by making it impossible for officials "reasonably [to] anticipate when their conduct may give rise to liability for damages." *Davis,*

*supra* at 195.[2]   It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, see *Mitchell, supra*, at 535, n. 12; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.   See, *e. g., Malley, supra*, at 344–345; *Mitchell, supra*, at 528; *Davis, supra*, at 191, 195.

Anderson contends that the Court of Appeals misapplied these principles.   We agree.   The Court of Appeals' brief discussion of qualified immunity consisted of little more than an assertion that a general right Anderson was alleged to have violated—the right to be free from warrantless searches of one's home unless the searching officers have probable cause and there are exigent circumstances—was clearly established.   The Court of Appeals specifically refused to consider the argument that it was *not* clearly established that the circumstances with which Anderson was confronted did

---

[2] The dissent, which seemingly would adopt this approach, seeks to avoid the unqualified liability that would follow by advancing the suggestion that officials generally (though not law enforcement officials, see *post*, at 654, 661–662, and officials accused of violating the Fourth Amendment, see *post*, at 659–667) be permitted to raise a defense of reasonable good faith, which apparently could be asserted and proved only at trial.   See *post*, at 653.   But even when so modified (and even for the fortunate officials to whom the modification applies) the approach would totally abandon the concern—which was the driving force behind *Harlow*'s substantial reformulation of qualified-immunity principles—that "insubstantial claims" against government officials be resolved prior to discovery and on summary judgment if possible.   *Harlow*, 457 U. S., at 818–819.   A passably clever plaintiff would always be able to identify an abstract clearly established right that the defendant could be alleged to have violated, and the good-faith defense envisioned by the dissent would be available only at trial.

not constitute probable cause and exigent circumstances. The previous discussion should make clear that this refusal was erroneous. It simply does not follow immediately from the conclusion that it was firmly established that warrantless searches not supported by probable cause and exigent circumstances violate the Fourth Amendment that Anderson's search was objectively legally unreasonable. We have recognized that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable. See *Malley, supra,* at 344–345. The same is true of their conclusions regarding exigent circumstances.

It follows from what we have said that the determination whether it was objectively legally reasonable to conclude that a given search was supported by probable cause or exigent circumstances will often require examination of the information possessed by the searching officials. But contrary to the Creightons' assertion, this does not reintroduce into qualified immunity analysis the inquiry into officials' subjective intent that *Harlow* sought to minimize. See *Harlow,* 457 U. S., at 815–820. The relevant question in this case, for example, is the objective (albeit fact-specific) question whether a reasonable officer could have believed Anderson's warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed. Anderson's subjective beliefs about the search are irrelevant.

The principles of qualified immunity that we reaffirm today require that Anderson be permitted to argue that he is entitled to summary judgment on the ground that, in light of the clearly established principles governing warrantless searches, he could, as a matter of law, reasonably have believed that the search of the Creightons' home was lawful.[3]

---

[3] The Creightons argue that the qualified immunity doctrine need not be expanded to apply to the circumstances of this case, because the Federal

## III

In addition to relying on the reasoning of the Court of Appeals, the Creightons advance three alternative grounds for affirmance. All of these take the same form, *i. e.*, that even if Anderson is entitled to qualified immunity under the usual principles of qualified immunity law we have just described, an exception should be made to those principles in the circumstances of this case. We note at the outset the heavy burden this argument must sustain to be successful. We have emphasized that the doctrine of qualified immunity reflects a balance that has been struck "across the board," *Harlow, supra,* at 821 (BRENNAN, J., concurring). See also *Malley,* 475 U. S., at 340 ("'For executive officers in general, . . . qualified immunity represents the norm'" (quoting *Harlow, supra,* at 807)).[4] Although we have in narrow circumstances provided officials with an absolute immunity, see,

_____

Government and various state governments have established programs through which they reimburse officials for expenses and liability incurred in suits challenging actions they have taken in their official capacities. Because our holding today does not extend official qualified immunity beyond the bounds articulated in *Harlow* and our subsequent cases, an argument as to why we should not do so is beside the point. Moreover, even assuming that conscientious officials care only about their personal liability and not the liability of the government they serve, the Creightons do not and could not reasonably contend that the programs to which they refer make reimbursement sufficiently certain and generally available to justify reconsideration of the balance struck in *Harlow* and subsequent cases. See 28 CFR § 50.15(c) (1987) (*permitting* reimbursement of Department of Justice employees when the Attorney General finds reimbursement appropriate); 5 F. Harper, F. James, & O. Gray, Law of Torts § 29.9, n. 20 (2d ed. 1986) (listing various state programs).

[4] These decisions demonstrate the emptiness of the dissent's assertion that "[t]oday this Court makes the fundamental error of simply assuming that *Harlow* immunity is just as appropriate for federal law enforcement officers . . . as it is for high government officials." *Post,* at 654 (footnote omitted). Just last Term the Court unanimously held that state and federal law enforcement officers were protected by the qualified immunity described in *Harlow. Malley* v. *Briggs,* 475 U. S. 335 (1986). We see no reason to overrule that holding.

*e. g., Nixon* v. *Fitzgerald,* 457 U. S. 731 (1982), we have been unwilling to complicate qualified immunity analysis by making the scope or extent of immunity turn on the precise nature of various officials' duties or the precise character of the particular rights alleged to have been violated. An immunity that has as many variants as there are modes of official action and types of rights would not give conscientious officials that assurance of protection that it is the object of the doctrine to provide. With that observation in mind, we turn to the particular arguments advanced by the Creightons.

First, and most broadly, the Creightons argue that it is inappropriate to give officials alleged to have violated the Fourth Amendment—and thus necessarily to have *unreasonably* searched or seized—the protection of a qualified immunity intended only to protect reasonable official action. It is not possible, that is, to say that one "reasonably" acted unreasonably. The short answer to this argument is that it is foreclosed by the fact that we have previously extended qualified immunity to officials who were alleged to have violated the Fourth Amendment. See *Malley, supra* (police officers alleged to have caused an unconstitutional arrest); *Mitchell* v. *Forsyth,* 472 U. S. 511 (1985) (officials alleged to have conducted warrantless wiretaps). Even if that were not so, however, we would still find the argument unpersuasive. Its surface appeal is attributable to the circumstance that the Fourth Amendment's guarantees have been expressed in terms of "unreasonable" searches and seizures. Had an equally serviceable term, such as "undue" searches and seizures been employed, what might be termed the "reasonably unreasonable" argument against application of *Harlow* to the Fourth Amendment would not be available—just as it *would* be available against application of *Harlow* to the Fifth Amendment if the term "reasonable process of law" had been employed there. The fact is that, regardless of the terminology used, the precise content of most of the Constitution's

civil-liberties guarantees rests upon an assessment of what accommodation between governmental need and individual freedom is reasonable, so that the Creightons' objection, if it has any substance, applies to the application of *Harlow* generally. We have frequently observed, and our many cases on the point amply demonstrate, the difficulty of determining whether particular searches or seizures comport with the Fourth Amendment. See, *e. g., Malley, supra,* at 341. Law enforcement officers whose judgments in making these difficult determinations are objectively legally reasonable should no more be held personally liable in damages than should officials making analogous determinations in other areas of law.

For the same reasons, we also reject the Creightons' narrower suggestion that we overrule *Mitchell, supra* (extending qualified immunity to officials who conducted warrantless wiretaps), by holding that qualified immunity may never be extended to officials who conduct unlawful warrantless searches.

Finally, we reject the Creightons' narrowest and most procrustean proposal: that no immunity should be provided to police officers who conduct unlawful warrantless searches of innocent third parties' homes in search of fugitives. They rest this proposal on the assertion that officers conducting such searches were strictly liable at English common law if the fugitive was not present. See, *e. g., Entick* v. *Carrington,* 19 How. St. Tr. 1029, 95 Eng. Rep. 807 (K. B. 1765). Although it is true that we have observed that our determinations as to the scope of official immunity are made in the light of the "common-law tradition,"[5] *Malley, supra,* at 342,

---

[5] Of course, it is the American rather than the English common-law tradition that is relevant, cf. *Malley, supra,* at 340–342; and the American rule appears to have been considerably less draconian than the English. See Restatement (Second) of Torts §§ 204, 206 (1965) (officers with an arrest warrant are privileged to enter a third party's house to effect arrest if they reasonably believe the fugitive to be there).

we have never suggested that the precise contours of official immunity can and should be slavishly derived from the often arcane rules of the common law. That notion is plainly contradicted by *Harlow,* where the Court completely reformulated qualified immunity along principles not at all embodied in the common law, replacing the inquiry into subjective malice so frequently required at common law with an objective inquiry into the legal reasonableness of the official action. See *Harlow,* 457 U. S., at 815–820. As we noted before, *Harlow* clearly expressed the understanding that the general principle of qualified immunity it established would be applied "across the board."

The approach suggested by the Creightons would introduce into qualified immunity analysis a complexity rivaling that which we found sufficiently daunting to deter us from tailoring the doctrine to the nature of officials' duties or of the rights allegedly violated. See *supra,* at 642–643. Just in the field of unlawful arrests, for example, a cursory examination of the Restatement (Second) of Torts (1965) suggests that special exceptions from the general rule of qualified immunity would have to be made for arrests pursuant to a warrant but outside the jurisdiction of the issuing authority, §§ 122, 129(a), arrests after the warrant had lapsed, §§ 122, 130(a), and arrests without a warrant, § 121. Both the complexity and the unsuitability of this approach are betrayed by the fact that the Creightons' proposal itself does not actually apply the musty rule that is purportedly its justification but instead suggests an exception to qualified immunity for all fugitive searches of third parties' dwellings, and not merely (as the English rule appears to have provided) for all *unsuccessful* fugitive searches of third parties' dwellings. Moreover, from the sources cited by the Creightons it appears to have been a corollary of the English rule that where the search *was* successful, no civil action would lie, whether or not probable cause for the search existed. That also is (quite pru-

dently but quite illogically) not urged upon us in the Creightons' selective use of the common law.

The general rule of qualified immunity is intended to provide government officials with the ability "reasonably [to] anticipate when their conduct may give rise to liability for damages." *Davis*, 468 U. S., at 195. Where that rule is applicable, officials can know that they will not be held personally liable as long as their actions are reasonable in light of current American law. That security would be utterly defeated if officials were unable to determine whether they were protected by the rule without entangling themselves in the vagaries of the English and American common law. We are unwilling to Balkanize the rule of qualified immunity by carving exceptions at the level of detail the Creightons propose. We therefore decline to make an exception to the general rule of qualified immunity for cases involving allegedly unlawful warrantless searches of innocent third parties' homes in search of fugitives.

For the reasons stated, we vacate the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.[6]

*It is so ordered.*

---

[6] Noting that no discovery has yet taken place, the Creightons renew their argument that, whatever the appropriate qualified immunity standard, some discovery would be required before Anderson's summary judgment motion could be granted. We think the matter somewhat more complicated. One of the purposes of the *Harlow* qualified immunity standard is to protect public officials from the "broad-ranging discovery" that can be "peculiarly disruptive of effective government." 457 U. S., at 817 (footnote omitted). For this reason, we have emphasized that qualified immunity questions should be resolved at the earliest possible stage of a litigation. *Id.*, at 818. See also *Mitchell* v. *Forsyth*, 472 U. S. 511, 526 (1986). Thus, on remand, it should first be determined whether the actions the Creightons allege Anderson to have taken are actions that a reasonable officer could have believed lawful. If they are, then Anderson is entitled to dismissal prior to discovery. Cf. *ibid.* If they are not, and if the actions Anderson claims he took are different from those the Creightons allege (and are actions that a reasonable officer could have believed lawful),

JUSTICE STEVENS, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, dissenting.

This case is beguiling in its apparent simplicity. The Court accordingly represents its task as the clarification of the settled principles of qualified immunity that apply in damages suits brought against federal officials. Its opinion, however, announces a new rule of law that protects federal agents who make forcible nighttime entries into the homes of innocent citizens without probable cause, without a warrant, and without any valid emergency justification for their warrantless search. The Court stunningly restricts the constitutional accountability of the police by creating a false dichotomy between police entitlement to summary judgment on immunity grounds and damages liability for every police misstep, by responding to this dichotomy with an uncritical application of the precedents of qualified immunity that we have developed for a quite different group of high public office holders, and by displaying remarkably little fidelity to the countervailing principles of individual liberty and privacy that infuse the Fourth Amendment.[1] Before I turn to the Court's opinion, it is appropriate to identify the issue confronted by the Court of Appeals. It is now apparent that it was correct in vacating the District Court's award of summary judgment to petitioner in advance of discovery.

I

The Court of Appeals understood the principle of qualified immunity as implemented in *Harlow* v. *Fitzgerald*, 457 U. S.

---

then discovery may be necessary before Anderson's motion for summary judgment on qualified immunity grounds can be resolved. Of course, any such discovery should be tailored specifically to the question of Anderson's qualified immunity.

[1] The Fourth Amendment provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

800 (1982), to shield government officials performing discretionary functions from exposure to damages liability unless their conduct violated clearly established statutory or constitutional rights of which a reasonable person would have known. Applying this principle, the Court of Appeals held that respondents' Fourth Amendment rights and the "exigent circumstances" doctrine were "clearly established" at the time of the search. *Creighton* v. *St. Paul,* 766 F. 2d 1269, 1277 (CA8 1985). Moreover, apparently referring to the "extraordinary circumstances" defense left open in *Harlow* for a defendant who "can prove that he neither knew nor should have known of the relevant legal standard," 457 U. S., at 819, the Court determined that petitioner could not reasonably have been unaware of these clearly established principles of law. Thus, in reviewing the Court of Appeals' judgment rejecting petitioner Anderson's claim to immunity, the first question to be decided is whether *Harlow* v. *Fitzgerald* requires immunity for a federal law enforcement agent who advances the fact-specific claim that a reasonable person in his position could have believed that his particular conduct would not violate rights that he concedes are clearly established. A negative answer to that question is required, both because *Harlow* provides an inappropriate measure of immunity when police acts that violate the Fourth Amendment are challenged, and also because petitioner cannot make the showing required for *Harlow* immunity. Second, apart from the particular requirements of the *Harlow* doctrine, a full review of the Court of Appeals' judgment raises the question whether this Court should approve a double standard of reasonableness—the constitutional standard already embodied in the Fourth Amendment and an even more generous standard that protects any officer who reasonably could have believed that his conduct was constitutionally reasonable. Because a careful analysis of the *Harlow*-related set of questions will be helpful in assessing the Court's continuing embrace of a double standard of reasonableness, I begin with

a discussion of petitioner's claim of entitlement to *Harlow* immunity.

## II

Accepting for the moment the Court's double standard of reasonableness, I would affirm the judgment of the Court of Appeals because it correctly concluded that petitioner has not satisfied the *Harlow* standard for immunity. The inquiry upon which the immunity determination hinges in this case illustrates an important limitation on the reach of the Court's opinion in *Harlow*. The defendants' claims to immunity at the summary judgment stage in *Harlow* and in *Mitchell* v. *Forsyth*, 472 U. S. 511 (1985), were bolstered by two policy concerns that are attenuated in suits against law enforcement agents in the field based on the Fourth Amendment. One was the substantial public interest in allowing government officials to devote their time and energy to the press of public business without the burden and distractions that invariably accompany the defense of a lawsuit. *Harlow*, 457 U. S., at 816–817; *Mitchell*, 472 U. S., at 524. The second underpinning of *Harlow* was the special unfairness associated with charging government officials with knowledge of a rule of law that had not yet been clearly recognized. *Harlow*, 457 U. S., at 818; *Mitchell*, 472 U. S., at 535.[2] Thus, if the

---

[2] This theme also pervades our pre-*Harlow* opinions construing the scope of official immunity in suits brought under 42 U. S. C. § 1983. Those precedents provide guidance for causes of action based directly on the Constitution, for "it would be 'untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials.'" *Harlow* v. *Fitzgerald*, 457 U. S., at 818, n. 30 (quoting *Butz* v. *Economou*, 438 U. S. 478, 504 (1978)). Accord, *Malley* v. *Briggs*, 475 U. S. 335, 340, n. 2 (1986). While it is unfair to expect officials to anticipate changes in the law with a prescience that escapes even the most able scholars, lawyers, and judges, our precedents recognize that qualified immunity is entirely consistent with the requirement that federal officials act in a way that is consistent with an awareness of the fundamental constitutional rights enumerated in the Bill of Rights of the Constitution. In

plaintiff's claim was predicated on a principle of law that was not clearly established at the time of the alleged wrong, both of those concerns would favor a determination of immunity not only in advance of trial, but of equal importance, before the time-consuming pretrial discovery process commenced. Concern for the depletion and diversion of public officials' energies led the Court in *Harlow* to abolish the doctrine that an official would be deprived of immunity on summary judgment if the plaintiff alleged that the official had acted with malicious intent to deprive his constitutional rights. See, *e. g.*, *Wood* v. *Strickland*, 420 U. S. 308, 322 (1975).

The Court's decision today, however, fails to recognize that *Harlow*'s removal of one arrow from the plaintiff's arsenal at

---

*Scheuer* v. *Rhodes*, 416 U. S. 232, 247–248 (1974), we based the qualified immunity of high government officials for official acts upon "the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief." In *Wood* v. *Strickland*, 420 U. S. 308, 322 (1975), we observed that a standard of "knowledge of the basic, unquestioned constitutional rights" of students "imposes neither an unfair burden upon a person assuming a responsible public office requiring a high degree of intelligence and judgment for the proper fulfillment of its duties, nor an unwarranted burden in light of the value which civil rights have in our legal system." In *O'Connor* v. *Donaldson*, 422 U. S. 563 (1975), we ruled that the immunity inquiry was, in relevant part, whether a state hospital superintendent charged with unconstitutionally confining a patient knew or reasonably should have known that his action would violate the patient's constitutional rights. And in *Procunier* v. *Navarette*, 434 U. S. 555, 565 (1978), the Court wrote:

"Because they could not reasonably have been expected to be aware of a constitutional right that had not yet been declared, petitioners did not act with such disregard for the established law that their conduct 'cannot reasonably be characterized as being in good faith.' *Wood* v. *Strickland*, 420 U. S., at 322."

Thus, even the immunity of officials whose discretionary duties are broader than those of a law enforcement officer does not extend to conduct which they should have known was contrary to a constitutional norm. *Harlow* did not change this rule. See 457 U. S., at 819. Even if it were appropriate to apply this standard of immunity to law enforcement agents in the field, it should certainly provide no shield for a warrantless nighttime search of a private home that was unsupported by probable cause.

the summary judgment stage did not also preclude the official from advancing a good-faith reasonableness claim at trial if *the character of his conduct* as established by the evidence warranted this strategy. The rule of the *Harlow* case, in contrast, focuses on *the character of the plaintiff's legal claim* and, when properly invoked, protects the government executive from spending his time in depositions, document review, and conferences about litigation strategy. Consistently with this overriding concern to avoid "the litigation of the subjective good faith of government officials," 457 U. S., at 816, *Harlow* does not allow discovery until the issue whether the official's alleged conduct violated a clearly established constitutional right has been determined on a motion for summary judgment. *Id.*, at 818. *Harlow* implicitly assumed that many immunity issues could be determined as a matter of law before the parties had exchanged depositions, answers to interrogatories, and admissions.[3]

The considerations underlying the formulation of the immunity rule in *Harlow* for Executive Branch officials, however, are quite distinct from those that led the Court to its prior recognition of immunity for federal law enforcement officials in suits against them founded on the Constitution. This observation is hardly surprising, for the question of immunity only acquires importance once a cause of action is created; the "practical consequences of a holding that no remedy has been authorized against a public official are essentially the same as those flowing from a conclusion that the official has absolute immunity." *Mitchell* v. *Forsyth*, 472 U. S., at 538 (STEVENS, J., concurring in judgment). Probing the

---

[3] "If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow*, 457 U. S., at 818. Logically, this reasoning does not extend to cases such as this one in which both the constitutional command and an exception to the rule for conduct that responds to a narrowly defined category of factual situations are clearly established, and the dispute is whether the situation that the officer confronted fits within the category.

question of immunity raised in this case therefore must begin, not with a rote recitation of the *Harlow* standard, but with an examination of the cause of action that brought the immunity question now before us into play in the first instance.

As every student of federal jurisdiction quickly learns, the Court in *Bivens* v. *Six Unknown Fed. Narcotics Agents,* 403 U. S. 388, 397 (1971), held that Bivens had a cause of action against federal agents "to recover money damages for any injuries he has suffered as a result of the agents' violation of the [Fourth] Amendment." In addition to finding that no cause of action was available, the District Court in that case had relied on the alternative holding that respondents were immune from liability because of their official position. Because the Court of Appeals for the Second Circuit had not passed on this immunity ruling, we did not consider it. *Id.,* at 397–398. On remand, in *Bivens* v. *Six Unknown Named Agents of Federal Bureau of Narcotics,* 456 F. 2d 1339, 1348 (1972), the Court of Appeals articulated a dual standard of reasonableness. As an initial matter, the Court rejected the agents' claim under *Barr* v. *Matteo,* 360 U. S. 564 (1959), which had recognized immunity for an official who performs "discretionary acts at those levels of government where the concept of duty encompasses the sound exercise of discretionary authority." *Id.,* at 575. The Second Circuit wisely noted that it "would be a sorry state of affairs if an officer had the 'discretion' to enter a dwelling at 6:30 A.M., without a warrant or probable cause . . . ." 456 F. 2d, at 1346. That court nevertheless recognized the need to balance protection of the police from "the demands of every person who manages to escape from the toils of the criminal law" against the "right of citizens to be free from unlawful arrests and searches." *Id.,* at 1347. According to the Second Circuit, the officer "must not be held to act at his peril"; to obtain immunity he "need not allege and prove probable cause in the constitutional sense." *Id.,* at 1348. Instead, an agent

should prevail if he could prove "not only that he believed, in good faith, that his conduct was lawful, but also that his belief was reasonable." *Ibid.* Thus, an affirmative defense of reasonable good faith was available *at trial.*[4] In contrast, an immunity claim of the *Harlow* type[5] that would foreclose any trial at all was not available and, in my view, was not appropriate. The strength of the reasonable good-faith defense in any specific case would, of course, vary with the trial evidence about the facts upon which the officer had relied when he made the challenged search or arrest.[6]

As the Court of Appeals recognized, assuring police officers the discretion to act in illegal ways would not be advan-

---

[4] Cf. *Gomez* v. *Toledo,* 446 U. S. 635, 640 (1980) (defendant has the burden of pleading good faith as an affirmative defense).

[5] "Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment. On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful. Until this threshold immunity question is resolved, discovery should not be allowed. If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow,* 457 U. S., at 818–819 (footnotes omitted).

[6] The Court of Appeals in *Bivens* justified the defense on the basis of the need to protect the officer from the hazards associated with trying to predict whether a court would agree with his assessment that a particular set of facts constituted probable cause. The court explained:

"The numerous dissents, concurrences and reversals, especially in the last decade, indicate that even learned and experienced jurists have had difficulty in defining the rules that govern a determination of probable cause, with or without a warrant. As he tries to find his way in this thicket, the police officer must not be held to act at his peril." *Bivens* v. *Six Unknown Named Agents of Federal Bureau of Narcotics,* 456 F. 2d 1339, 1348 (CA2 1972) (citations omitted).

tageous to society. While executives such as the Attorney General of the United States or a senior assistant to the President of the United States must have the latitude to take action in legally uncharted areas without constant exposure to damages suits, and are therefore entitled to a rule of qualified immunity from many pretrial and trial proceedings, quite different considerations led the Second Circuit to recognize the affirmative defense of reasonable good faith in the *Bivens* case. Today this Court nevertheless makes the fundamental error of simply assuming that *Harlow* immunity is just as appropriate for federal law enforcement officers such as petitioner[7] as it is for high government officials.[8] The doctrinal reach and precedential sweep of this moment of forgetfulness are multiplied because of the interchangeability of immunity precedents between § 1983 suits against state officials and *Bivens* actions against federal officials. Moreover, for the moment restricting my criticism of the Court's analysis to the four corners of the *Harlow* framework, the Court errs by treating a denial of immunity for failure to satisfy the *Harlow*

---

[7] "Is it not inferable that the point of the remand [to the Court of Appeals in *Bivens*] was to ventilate the question of the possible existence of the kind of qualified privilege the Court of Appeals sustained, rather than the issue of immunity?" P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler, Hart and Wechsler's The Federal Courts and the Federal System 1421 (2d ed. 1973).

[8] The Court asserts that this assumption merely reflects our holding last Term in *Malley* v. *Briggs*, 475 U. S., at 340. See *ante*, at 642, n. 4. The *Malley* case, however, rejected a police officer's claim that he was entitled to absolute immunity because he had acted pursuant to an arrest warrant issued by a magistrate. We specifically declined to accept the petitioner's invitation "to expand what was a qualified immunity at common law into an absolute immunity." 475 U. S., at 342. We concluded that in "the case of the officer applying for a warrant" a rule of qualified immunity based on the *Harlow* standard would give "ample room for mistaken judgments." 475 U. S., at 343. Our opinion carefully avoided any comment on warrantless searches or the proper application of *Harlow* in cases in which the claim of "qualified immunity" could not be evaluated in advance of discovery.

standard as necessarily tantamount to a ruling that the defendants are exposed to damages liability for their every violation of the Fourth Amendment.[9]   Such a denial would not necessarily foreclose an affirmative defense based on the Second Circuit's thesis in *Bivens* that an officer may not be liable if his conduct complied with a lesser standard of reasonableness than the constitutional standard which it violated.   The Court's failure to recognize that federal agents may retain a partial shield from damages liability, although not necessarily from pretrial and trial proceedings, leads it to the erroneous conclusion that petitioner must have *Harlow* immunity or else none at all save the Fourth Amendment itself.[10]

In Part III, I explain why the latter alternative is appropriate.   For now, I assert the more limited proposition that the Court of Appeals quite correctly rejected Anderson's claim that he is entitled to immunity under *Harlow*.   *Harlow* does not speak to the extent, if any, of an official's insulation from monetary liability when the official concedes that the constitutional right he is charged with violating was deeply etched in our jurisprudence, but argues that he reasonably believed that *his* particular actions comported with the constitutional command.   In this case the District Judge granted Anderson's motion for summary judgment because she was convinced that the agent had probable cause to enter the Creightons' home and that the absence of a search warrant was justified by exigent circumstances.   In other words, the

---

[9] "But if the test of 'clearly established law' were to be applied at this level of generality, . . . [p]laintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability . . . ." *Ante*, at 639.

[10] The Court does not consider the possibility that the "objective reasonableness" of the officer's conduct may depend on the resolution of a factual dispute.   Such a dispute may preclude the entry of summary judgment but, despite the Court's intimation to the contrary, see *ante*, at 640, n. 2, should not necessarily prevent a jury from resolving the factual issues in the officer's favor and thereafter concluding that his conduct was objectively reasonable.

District Judge concluded as a matter of law that there was no substantive constitutional violation. When respondents appealed, petitioner argued that even if the Constitution was violated, he was entitled to immunity because the law defining exigent circumstances was not clearly established when he searched the Creightons' home.[11] In setting aside the order granting summary judgment, the Court of Appeals concluded that many essential factual matters were sharply disputed and that if the Creightons' version of the incident were accepted, there was neither probable cause nor an exigent-circumstances justification for the search. It was therefore necessary to try the case to find out whether the Fourth Amendment had been violated. *Creighton* v. *St. Paul,* 766 F. 2d, at 1277. The Court of Appeals' conclusion that summary judgment on the probable-cause and exigent-circumstances issues was not appropriate in advance of discovery was unquestionably correct.

The Court of Appeals also was correct in rejecting petitioner's argument based on the holding in *Harlow* that the qualified-immunity issue ought to be resolved on a motion for summary judgment before any discovery has taken place. 457 U. S., at 818–819.[12] The Court of Appeals rejected this

---

[11] He also made this argument in District Court. See Memorandum of Points and Authorities 29, 1 Record A–52.

[12] The *Harlow* standard of qualified immunity precludes a plaintiff from alleging the official's malice in order to defeat a qualified-immunity defense. By adopting a purely objective standard, however, *Harlow* may be inapplicable in at least two types of cases. In the first, the plaintiff can only obtain damages if the official's culpable state of mind is established. See, *e. g., Allen* v. *Scribner,* 812 F. 2d 426, 436 (CA9 1987); Note, Qualified Immunity for Government Officials: The Problem of Unconstitutional Purpose in Civil Rights Litigation, 95 Yale L. J. 126, 136–137 (1985). In the second, an official's conduct is not susceptible to a determination that it violated clearly established law because it is regulated by an extremely general and deeply entrenched norm, such as the command of due process or probable cause. The principle is clearly established, but whether it would brand the official's planned conduct as illegal often cannot be ascertained without reference to facts that may be in dispute. See *Reardon* v.

argument because it was convinced that the rule of law was clear. It also could have rejected the argument on an equally persuasive ground—namely, that the *Harlow* requirement concerning clearly established law applies to *the rule on which the plaintiff relies*, and that there was no doubt about the proposition that a warrantless entry into a home without probable cause is always unlawful.[13] The court does not even reach the exigent-circumstances inquiry unless and until the defendant has shown probable cause and is trying to establish that the search was legal notwithstanding the failure of the police to obtain a warrant. Thus, if we assume that the Court of Appeals was correct in its conclusion that probable cause had not been established, it was also correct in rejecting petitioner's claim to *Harlow* immunity, either because the exigent-circumstances exception to the warrant requirement was clearly established, or because a warrantless entry into a home without probable cause is always unlawful whether or not exigent circumstances are present.

In this Court, Anderson has not argued that any relevant rule of law—whether the probable-cause requirement

---

*Wroan*, 811 F. 2d 1025 (CA7 1987) (police officers denied qualified immunity on summary judgment because their conclusion of probable cause could be found objectively unreasonable when the facts are viewed in light most favorable to the plaintiffs); *Jasinski* v. *Adams*, 781 F. 2d 843 (CA11 1986) *(per curiam)* (federal agent denied qualified immunity on summary judgment because of genuine issue of probable cause); *Deary* v. *Three Un-Named Police Officers*, 746 F. 2d 185 (CA3 1984) (police officers denied qualified immunity on summary judgment because of genuine issue of probable cause).

[13] The Court's opinion reveals little, if any, interest in the facts of this case in which the complaint unquestionably alleged a violation of a clearly established rule of law. Instead, the Court focuses its attention on the hypothetical case in which a complaint drafted by a "passably clever plaintiff" is able to allege a "violation of extremely abstract rights." *Ante*, at 639, and n. 2. I am more concerned with the average citizen who has alleged that law enforcement officers forced their way into his home without a warrant and without probable cause. The constitutional rule allegedly violated in this case is both concrete and clearly established.

or the exigent-circumstances exception to the warrant requirement—was not "clearly established" in November 1983. Rather, he argues that a competent officer might have concluded that the particular set of facts he faced did constitute "probable cause" and "exigent circumstances," and that his own reasonable belief that the conduct engaged in was within the law suffices to establish immunity. But the factual predicate for Anderson's argument is not found in the Creightons' complaint, but rather in the affidavits that he has filed in support of his motion for summary judgment. Obviously, the respondents must be given an opportunity to have discovery to test the accuracy and completeness of the factual basis for the immunity claim. Neither this Court,[14] nor petitioner,[15] disagrees with this proposition. It is therefore pellucidly clear that the Court of Appeals was correct in its conclusion that the record before it did not support the summary judgment.

The Court's decision today represents a departure from the view we expressed two years ago in *Mitchell* v. *Forsyth*, 472 U. S. 511 (1985). We held that petitioner was entitled to qualified immunity for authorizing an unconstitutional wiretap because it was not clearly established that warrantless domestic security wiretapping violated the Fourth Amendment. We added in a footnote:

> "We do not intend to suggest that an official is always immune from liability or suit for a warrantless search merely because the warrant requirement has never explicitly been held to apply to a search conducted in identical circumstances. But in cases where there is a legitimate question whether an exception to the warrant requirement exists, it cannot be said that a warrantless search violates clearly established law." *Id.*, at 535, n. 12.

---

[14] See *ante*, at 646–647, n. 6.
[15] See Brief for Petitioner 33–34, n. 18.

Of course, the probable-cause requirement for an officer who faces the situation petitioner did was clearly established. In addition, an officer's belief that his particular warrantless search was justified (by exigent circumstances, in this case) is analytically no different from a situation in which the warrant requirement has not been explicitly held to apply to the particular search undertaken by the officer—the precise situation in which, as the Court recognized in *Mitchell* v. *Forsyth*, there would certainly be no immunity. The good-faith argument advanced by petitioner might support a judgment in his favor after there has been a full examination of the facts, but it is not the kind of claim to immunity, based on the tentativeness or nonexistence of the constitutional rule allegedly violated by the officer, that we accepted in *Harlow* or in *Mitchell*.

## III

Although the question does not appear to have been argued in, or decided by, the Court of Appeals, this Court has decided to apply a double standard of reasonableness in damages actions against federal agents who are alleged to have violated an innocent citizen's Fourth Amendment rights. By double standard I mean a standard that affords a law enforcement official two layers of insulation from liability or other adverse consequence, such as suppression of evidence. Having already adopted such a double standard in applying the exclusionary rule to searches authorized by an invalid warrant, *United States* v. *Leon*, 468 U. S. 897 (1984), the Court seems prepared and even anxious in this case to remove any requirement that the officer must obey the Fourth Amendment when entering a private home. I remain convinced that in a suit for damages as well as in a hearing on a motion to suppress evidence, "an official search and seizure cannot be both 'unreasonable' and 'reasonable' at the same time." *Id.*, at 960 (STEVENS, J., dissenting).

A "federal official may not with impunity ignore the limitations which the controlling law has placed on his powers."

*Butz* v. *Economou*, 438 U. S. 478, 489 (1978). The effect of the Court's (literally unwarranted) extension of qualified immunity, I fear, is that it allows federal agents to ignore the limitations of the probable-cause and warrant requirements with impunity. The Court does so in the name of avoiding interference with legitimate law enforcement activities even though the probable-cause requirement, which limits the police's exercise of coercive authority, is itself a form of immunity that frees them to exercise that power without fear of strict liability. See *Pierson* v. *Ray*, 386 U. S. 547 (1967).

The Court advances four arguments in support of the position that even though an entry into a private home is constitutionally unreasonable, it will not give rise to monetary liability if a reasonable officer could have believed it was reasonable: First, the probable-cause standard is so vague that it is unfair to expect law enforcement officers to comply with it;[16] second, the reasons for not saddling high government officials with the burdens of litigation apply equally to law enforcement officers;[17] third, there is nothing new in the Court's decision today because "we have previously extended qualified immunity to officials who were alleged to have violated the Fourth Amendment," *ante*, at 643, and finally, holding police officers to the constitutional standard of reasonableness would "unduly inhibit officials in the discharge of their duties," *ante*, at 638. None of these arguments on behalf of a double standard of reasonableness is persuasive to me.

Unquestionably, there is, and always has been, some uncertainty in the application of the probable-cause standard to particular cases. It is nevertheless a standard that has sur-

---

[16] "We have frequently observed, and our many cases on the point amply demonstrate, the difficulty of determining whether particular searches or seizures comport with the Fourth Amendment." *Ante*, at 644.

[17] "Law enforcement officers whose judgments in making these difficult determinations are objectively legally reasonable should no more be held personally liable in damages than should officials making analogous determinations in other areas of law." *Ibid.*

vived the test of time both in England and in America.  See 2 M. Hale, History of the Pleas of the Crown 150 (1847); J. Jolowicz & T. Lewis, Winfield on Tort 579–580 (8th ed. 1967); Weber, The Birth of Probable Cause, 11 Anglo-Am. L. Rev. 155, 166 (1982).  Except in cases in which an officer relies on the fact that a magistrate has issued a warrant, there is no reason to believe that the Court's newly minted standard will provide any more certainty than the constitutional standard. Indeed, it is worth emphasizing that the probable-cause standard itself recognizes the fair leeway that law enforcement officers must have in carrying out their dangerous work.  The concept of probable cause leaves room for mistakes, provided always that they are mistakes that could have been made by a reasonable officer.  See 1 W. LaFave, Search and Seizure 567 (2d ed. 1987).  I find nothing in this Court's new standard that provides the officer with any more guidance than the statement in our opinion in *Brinegar* v. *United States*, 338 U. S. 160 (1949), almost four decades ago:

> "These long-prevailing standards seek to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime.  They also seek to give fair leeway for enforcing the law in the community's protection.  Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part.  But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability.  The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests.  Requiring more would unduly hamper law enforcement.  To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice." *Id.*, at 176.

The suggestion that every law enforcement officer should be given the same measure of immunity as a Cabinet officer

or a senior aide to the President of the United States is not compelling. Testifying in court is a routine part of an officer's job; his or her participation in litigation does not occasion nearly as great a disruption of everyday duties as it would with those of a senior government official. Moreover, the political constraints that deter high government officials from violating the Constitution[18] have only slight, if any, application to police officers, and may actually lead to more, rather than less, vigorous enforcement activity. It is thus quite wrong simply to assume that the considerations that justified the decision in *Harlow* v. *Fitzgerald* also justify an equally broad rule of immunity for police officers. As we reasoned in *Scheuer* v. *Rhodes*, 416 U. S. 232, 245–247 (1974):

> "When a court evaluates police conduct relating to an arrest its guideline is 'good faith and probable cause.' . . . In the case of higher officers of the executive branch, however, the inquiry is far more complex since the range of decisions and choices—whether the formulation of policy, of legislation, or budgets, or of day-to-day decisions—is virtually infinite. . . . [S]ince the options which a chief executive and his principal subordinates must consider are far broader and far more subtle than those made by officials with less responsibility, the range of discretion must be comparably broad."

---

[18] "Intense scrutiny, by the people, by the press, and by Congress, has been the traditional method for deterring violations of the Constitution by these high officers of the Executive Branch. Unless Congress authorizes other remedies, it presumably intends the retributions for any violations to be undertaken by political action. Congress is in the best position to decide whether the incremental deterrence added by a civil damages remedy outweighs the adverse effect that the exposure to personal liability may have on governmental decisionmaking. However the balance is struck, there surely is a national interest in enabling Cabinet officers with responsibilities in this area to perform their sensitive duties with decisiveness and without potentially ruinous hesitation." *Mitchell* v. *Forsyth*, 472 U. S. 511, 541 (1985) (STEVENS, J., concurring in judgment).

The Court supports its assertion that we have previously extended qualified immunity to officials who are alleged to have violated the Fourth Amendment, *ante*, at 643, by reference to two cases: *Malley* v. *Briggs*, 475 U. S. 335 (1986), which involved a search pursuant to a warrant, and *Mitchell* v. *Forsyth*, 472 U. S. 511 (1985), in which the plaintiff relied on a rule of law that was not clearly established at the time of the alleged wrong. Neither of these cases supports the proposition that a warrantless search should be evaluated under a standard less strict than the constitutional standard of reasonableness.[19] Despite its protestations to the contrary, the Court makes new law today.

The argument that police officers need special immunity to encourage them to take vigorous enforcement action when they are uncertain about their right to make a forcible entry into a private home has already been accepted in our jurisprudence. We have held that the police act reasonably in entering a house when they have probable cause to believe a fugitive is in the house and exigent circumstances make it impracticable to obtain a warrant. This interpretation of the Fourth Amendment allows room for police intrusion, without a warrant, on the privacy of even innocent citizens. In *Pierson* v. *Ray*, 386 U. S., at 555, we held that police officers would not be liable in an action brought under 42 U. S. C. § 1983 "if they acted in good faith and with probable cause . . . ." We explained: "Under the prevailing view in this country a peace officer who arrests someone with probable cause is not liable for false arrest simply because the inno-

---

[19] "The good-faith exception for searches conducted pursuant to warrants is not intended to signal our unwillingness strictly to enforce the requirements of the Fourth Amendment, and we do not believe that it will have this effect. As we have already suggested, the good-faith exception, turning as it does on objective reasonableness, should not be difficult to apply in practice. When officers have acted pursuant to a warrant, the prosecution should ordinarily be able to establish objective good faith without a substantial expenditure of judicial time." *United States* v. *Leon*, 468 U. S. 897, 924 (1984).

cence of the suspect is later proved. Restatement, Second, Torts § 121 (1965); 1 Harper & James, The Law of Torts § 3.18, at 277–278 (1956); *Ward* v. *Fidelity & Deposit Co. of Maryland*, 179 F. 2d 327 (CA 8th Cir. 1950). A policeman's lot is not so unhappy that he must choose between being charged with dereliction of duty if he does not arrest when he has probable cause, and being mulcted in damages if he does." *Ibid.*

Thus, until now the Court has not found intolerable the use of a probable-cause standard to protect the police officer from exposure to liability simply because his reasonable conduct is subsequently shown to have been mistaken. Today, however, the Court counts the law enforcement interest twice[20] and the individual's privacy interest only once.

The Court's double-counting approach reflects understandable sympathy for the plight of the officer and an overriding interest in unfettered law enforcement. It ascribes a far lesser importance to the privacy interest of innocent citizens than did the Framers of the Fourth Amendment. The importance of that interest and the possible magnitude of its invasion are both illustrated by the facts of this case.[21] The

[20] "The question whether they had probable cause depends on what they reasonably believed with reference to the facts that confronted them, as the judge instructed in the passage we quoted earlier. To go on and instruct the jury further that even if the police acted without probable cause they should be exonerated if they reasonably (though erroneously) believed that they were acting reasonably is to confuse the jury and give the defendants two bites at the apple." *Llaguno* v. *Mingey*, 763 F. 2d 1560, 1569 (CA7 1985) (Posner, J.) (en banc).

[21] The Court of Appeals described the search of respondents' home in some detail. Its opinion reads, in part, as follows:

"Because the case was dismissed on Anderson's motion for summary judgment, we set out the facts in the light most favorable to the Creightons and draw all inferences from the underlying facts in their favor. *Adickes* v. *Kress & Co.*, 398 U. S. 144, 158–59 . . . (1970). On the night of November 11, 1983, Sarisse and Robert Creighton and their three young daughters were spending a quiet evening at their home when a spotlight suddenly

home of an innocent family was invaded by several officers without a warrant, without the owner's consent, with a substantial show of force, and with blunt expressions of disrespect for the law and for the rights of the family members.

flashed through their front window. Mr. Creighton opened the door and was confronted by several uniformed and plain clothes officers, many of them brandishing shotguns. All of the officers were white; the Creightons are black. Mr. Creighton claims that none of the officers responded when he asked what they wanted. Instead, by his account (as verified by a St. Paul police report), one of the officers told him to 'keep his hands in sight' while the other officers rushed through the door. When Mr. Creighton asked if they had a search warrant, one of the officers told him, 'We don't have a search warrant [and] don't need [one]; you watch too much TV.'

"Mr. Creighton asked the officers to put their guns away because his children were frightened, but the officers refused. Mrs. Creighton awoke to the shrieking of her children, and was confronted by an officer who pointed a shotgun at her. She allegedly observed the officers yelling at her three daughters to 'sit their damn asses down and stop screaming.' She asked the officer, 'What the hell is going on?' The officer allegedly did not explain the situation and simply said to her, 'Why don't you make your damn kids sit on the couch and make them shut up.'

"One of the officers asked Mr. Creighton if he had a red and silver car. As Mr. Creighton led the officers downstairs to his garage, where his maroon Oldsmobile was parked, one of the officers punched him in the face, knocking him to the ground, and causing him to bleed from the mouth and the forehead. Mr. Creighton alleges that he was attempting to move past the officer to open the garage door when the officer panicked and hit him. The officer claims that Mr. Creighton attempted to grab his shotgun, even though Mr. Creighton was not a suspect in any crime and had no contraband in his home or on his person. Shaunda, the Creighton's ten-year-old daughter, witnessed the assault and screamed for her mother to come help. She claims that one of the officers then hit her.

"Mrs. Creighton phoned her mother, but an officer allegedly kicked and grabbed the phone and told her to 'hang up that damn phone.' She told her children to run to their neighbor's house for safety. The children ran out and a plain clothes officer chased them. The Creightons' neighbor allegedly told Mrs. Creighton that the officer ran into her house and grabbed Shaunda by the shoulders and shook her. The neighbor allegedly told the officer, 'Can't you see she's in shock; leave her alone and get out of my house.' Mrs. Creighton's mother later brought Shaunda to the emergency

As the case comes to us, we must assume that the intrusion violated the Fourth Amendment. See *Steagald* v. *United States*, 451 U. S. 204, 211 (1981). Proceeding on that assumption, I see no reason why the family's interest in the security of its own home should be accorded a lesser weight than the Government's interest in carrying out an invasion that was unlawful.[22] Arguably, if the Government considers it important not to discourage such conduct, it should provide indemnity to its officers. Preferably, however, it should furnish the kind of training for its law enforcement agents that would entirely eliminate the necessity for the Court to distinguish between the conduct that a competent officer considers reasonable and the conduct that the Constitution deems rea-

---

room at Children's Hospital for an arm injury caused by the officer's rough handling.

"During the melee, family members and friends began arriving at the Creighton's home. Mrs. Creighton claims that she was embarrassed in front of her family and friends by the invasion of their home and their rough treatment as if they were suspects in a major crime. At this time, she again asked Anderson for a search warrant. He allegedly replied, 'I don't need a damn search warrant when I'm looking for a fugitive.' The officers did not discover the allegedly unspecified 'fugitive' at the Creightons' home or any evidence whatsoever that he had been there or that the Creightons were involved in any type of criminal activity. Nonetheless, the officers then arrested and handcuffed Mr. Creighton for obstruction of justice and brought him to the police station where he was jailed overnight, then released without being charged." *Creighton* v. *St. Paul*, 766 F. 2d 1269, 1270–1271 (CA8 1985) (footnote and citation omitted).

[22] Because this case involves the rule that should be applied to the conduct of a law enforcement officer employed by the Federal Government, Justice Jackson's dissenting opinion in *Brinegar* v. *United States*, 338 U. S. 160 (1949), is especially pertinent. He wrote, in part:

"These [Fourth Amendment rights], I protest, are not mere second-class rights but belong in the catalog of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government." *Id.*, at 180.

sonable.[23] "Federal officials will not be liable for mere mistakes in judgment, whether the mistake is one of fact or one of law." *Butz* v. *Economou*, 438 U. S., at 507. On the other hand, surely an innocent family should not bear the entire risk that a trial court, with the benefit of hindsight, will find that a federal agent reasonably believed that he could break into their home equipped with force and arms but without probable cause or a warrant.

## IV

The Court was entirely faithful to the traditions that have been embedded in our law since the adoption of the Bill of Rights when it wrote:

> "The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home— a zone that finds its roots in clear and specific constitutional terms: 'The right of the people to be secure in their

---

[23] The Court's holding that a federal law enforcement officer is immune if a reasonable officer could have believed that the search was consistent with the Fourth Amendment raises the same difficulties in application as the Court's creation in *United States* v. *Leon* of a good-faith exception to the exclusionary rule when the police officer's reliance on an invalid warrant was objectively reasonable:

"Suppose, for example, that the challenge is to a search and seizure conducted by an FBI agent. The defendant shows that the agent was required to be aware of, and fully aware of, all relevant fourth amendment law. Would the reasonable reliance inquiry turn on whether a particular FBI agent's conduct lived up to the standards expected from someone who was apprised of, or should have been apprised of, relevant fourth amendment law? Or is it enough that the agent's conduct met the lower standard of the average well-trained police officer? . . . If th[e] individualized objective standard is to be the test under *Leon*, then motions to suppress may well require a far greater expenditure of judicial time than the Court seems to think should be devoted to protecting fourth amendment interests." Wasserstrom & Mertens, The Exclusionary Rule on the Scaffold: But Was It A Fair Trial?, 22 Am. Crim. L. Rev. 85, 120 (1984) (footnotes omitted).

. . . houses . . . shall not be violated.' That language unequivocally establishes the proposition that '[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.' *Silverman* v. *United States*, 365 U. S. 505, 511 [1961]. In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton* v. *New York*, 445 U. S. 573, 589–590 (1980).[24]

The warrant requirement safeguards this bedrock principle of the Fourth Amendment, while the immunity bestowed on a police officer who acts with probable cause permits him to do his job free of constant fear of monetary liability. The Court rests its doctrinally flawed opinion upon a double standard of reasonableness which unjustifiably and unnecessarily upsets the delicate balance between respect for individual privacy and protection of the public servants who enforce our laws.

I respectfully dissent.

---

[24] "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Welsh* v. *Wisconsin*, 466 U. S. 740, 748 (1984) (quoting *United States* v. *United States District Court*, 407 U. S. 297, 313 (1972)).