**Garth MAAG, Plaintiff–Appellee,**

v.

**Richard WESSLER; Mike Boyer; Michael Sukut; City of Glasgow, Montana; Valley County, Montana, Defendants–Appellants.**

**No. 90–35453.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 8, 1991.

Decided Sept. 23, 1991.

As Amended on Denial of Rehearing and Rehearing En Banc April 1, 1992.

---

Joseph M. Sullivan, Emmons & Sullivan, J. David Slovak and Mark F. Higgins, Ugrin, Alexander, Zadick & Slovak, Great Falls, Mont., for defendants-appellants.

Donald W. Molloy, Anderson & Molloy, Rodney T. Hartman, Herndon, Hartman, Sweeney & Halverson, Billings, Mont., for plaintiff-appellee.

Before: WALLACE, Chief Judge, O'SCANNLAIN and LEAVY, Circuit Judges.

## PER CURIAM:

This is an action filed by Garth Maag of Glasgow, Montana, under 42 U.S.C. § 1983 against three police officers and the City of Glasgow and Valley County, Montana, for taking him into custody for a medical evaluation. The officers, Richard Wessler, Mike Boyer, and Michael Sukut, appeal the denial of their motion for summary judgment in which they asserted a defense of qualified immunity. We have jurisdiction under 28 U.S.C. § 1291. *Duran v. City of Douglas, Arizona*, 904 F.2d 1372, 1375 (9th Cir.1990); *Baker v. Racansky*, 887 F.2d 183, 185 (9th Cir.1989).

We reverse. We hold that the officers are immune because there was probable cause to take Maag into custody.

## FACTS

On the evening of July 9, 1987, Arnetta Braaten, who was Garth Maag's wife; Kay Jackson, who is Braaten's daughter; and Kay's sister-in-law, Marlene Jackson, asked for police assistance when they could not locate Maag. Maag, who had been suffering for several weeks from the effects of mixing toxic pesticides, was very weak, lacked motor coordination, had slurred speech, and was irrational at times. That evening, Maag had insisted on driving to Glasgow for supplies even though he knew the supply store had closed. When one of the women refused to let him drive, he began to walk the more than three miles into Glasgow. His wife became concerned that, in his condition, he would be killed or injured along the highway. The women called a friend of Maag's, Bert Osen, for assistance. They then searched for Maag, but could not locate him along the highway or in Glasgow. At that point, Kay Jackson requested help from the police. The police and the women then returned to Maag's farm, where Osen was waiting, to search for Maag.

Maag appeared at the farm shortly thereafter, having been driven to Glasgow and back by an acquaintance. Upon his return, Maag insisted on driving his pickup to the field to check his irrigation, despite Officer Boyer's request that he not drive in

his condition. Osen was concerned enough to follow Maag to the field to see if he was all right.

When Maag returned, he appeared disoriented and lost his balance when entering the house. Then, uttering profanities, he struck one of the women in the face with a wet sock when she tried to help him remove his shoes. After this incident he went to the bathroom to take a bath.

Because of the women's continued concern about Maag's welfare, their requests that the police take Maag to the hospital, and the officers' verification of Maag's poor physical and mental condition, Deputy Wessler called a physician, Dr. Gordon Bell. Deputy Wessler informed Dr. Bell what the women had told him about Maag's condition, and what the officers themselves had observed. Dr. Bell advised the officers to bring Maag to the hospital.

When the officers informed Maag that Dr. Bell wanted to see him, Maag refused to discuss anything or to go voluntarily to the hospital. The officers handcuffed him, placed him in the police car, and took him to the hospital. At Arnetta Braaten's request, the officers also removed Maag's guns from the home and gave them to Kay Jackson and Osen for safekeeping.

At the hospital, Dr. Bell decided to keep Maag overnight for observation.[1] Dr. Bell reported that Maag was "distinctly uncooperative," "wasn't willing to speak to me at all," and "was not able to give [any] indication that he was able to carry out logical thinking." Bell Deposition, at 6–8. While at the hospital, Maag refused to use the bathroom facilities and defecated on himself. The next morning, Maag was released.

Thereafter, Maag filed this action, claiming his constitutional right to be free from

unreasonable seizure under the fourth amendment had been violated.

## DISCUSSION

■ At the outset, we note that the source of Maag's constitutional right against unreasonable seizure is the fourth amendment. *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989). Although confinement of the mentally ill by state action generally is analyzed under the due process clause of the fourteenth amendment, *see O'Connor v. Donaldson*, 422 U.S. 563, 573–76, 95 S.Ct. 2486, 2492–94, 45 L.Ed.2d 396 (1975), we analyze here the distinct right to be free from an unreasonable governmental seizure of the person for whatever purpose. *Graham*, 490 U.S. at 395, 109 S.Ct. at 1871.

We do not, however, determine the broad question of whether the seizure of Maag violated the fourth amendment's proscription against unreasonable seizures, as Maag would have it.[2] To do so would merely state Maag's right in the abstract, rather than his rights under the particular circumstances of this case as the Supreme Court has mandated. *See Anderson v. Creighton*, 483 U.S. 635, 639–40, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987); *see also Tribble v. Gardner*, 860 F.2d 321, 323–24 (9th Cir.1988), *cert. denied*, 490 U.S. 1075, 109 S.Ct. 2087, 104 L.Ed.2d 650 (1989).

Although there are few decisions that discuss the fourth amendment standard in the context of seizure of the mentally ill, all have recognized the proposition that such a seizure is analogous to a criminal arrest and must therefore be supported by probable cause. *See, e.g., Gooden v. Howard*

---

**1.** Medical tests showed that Maag had suffered a loss of sensation in his feet, especially his sense of position; that he could not close his eyes and stand up without falling forward; and that his gait was unsteady. Bell Deposition at 9. Dr. Bell especially noted that it would have been fairly easy for Maag to trip, fall, or lose his balance, and that there could be potential dangers if Maag operated a motor vehicle. *Id.* at 9–10. Dr. Bell was particularly concerned about

Maag's lack of ability to make sound judgments. *Id.* at 10.

**2.** Maag claims that the issue before us is "[w]hether ... the police without a warrant may enter a man's home at night, seize his person and property, wrap him in a bath robe, slippers and handcuffs [sic] and take him into custody, not because of the suspicion of criminal activity or danger, but rather because he appears 'sick.'" Appellee's Brief at 3.

*County, Maryland,* ,917 F.2d 1355, 1361 (4th Cir.1990); *McKinney v. George,* 726 F.2d 1183, 1187 (7th Cir.1984); *Harris v. Pirch,* 677 F.2d 681, 686 (8th Cir.1982); *In re Barnard,* 455 F.2d 1370, 1373 (D.C.Cir. 1971).

The officers claim they had clear authority to take Maag into custody pursuant to section 53–21–129 of the Montana Code Annotated, which states in pertinent part:

*Emergency situation—petition—detention.*

(1) When an emergency situation exists, a peace officer may take any person who appears to be seriously mentally ill and as a result of serious mental illness to be a danger to others or to himself into custody only for a sufficient time to contact a professional person for emergency evaluation. If possible, a professional person should be called prior to taking the person into custody.

(2) If the professional person agrees that the person detained appears to be seriously mentally ill and that an emergency situation exists, then the person may be detained and treated until the next regular business day.

It is clear from the depositions that at the time of Maag's seizure, each officer knew that he could take into protective custody any person who appeared to be a danger to himself or others.[3]

Thus we find that the officers had probable cause to take Maag into protective custody, based on the Montana statute, the information from family members and friends, the officers' own observations, and Dr. Bell's recommendation that Maag be brought to the hospital. There is nothing in the record to indicate that the officers acted with less than reasonable good faith. Therefore, they are immune. We also find the removal of Maag's guns at the family's request was a reasonable precaution to prevent potential harm.

We remand to the district court for consideration of the appellants' request for attorney fees under 42 U.S.C. § 1988.

REVERSED and REMANDED.

---

**3.** Maag states the officers could not cite specifically to section 53–21–129 and that therefore, they could not have known that they had authority to seize Maag. This argument lacks merit. An officer is not required to have "the kind of legal scholarship normally associated with law professors and academicians." *Ward v. County of San Diego,* 791 F.2d 1329, 1332 (9th Cir.1986), *cert. denied,* 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987). It is sufficient that the officers knew generally of statutory or other authority to support the action they took.