**Bobby Gene JOHNSON, et al., Plaintiffs,**

v.

**John M. COLGATE, et al., Defendants.**

**No. 87–826–CIV–T–17(C).**

United States District Court, M.D. Florida, Tampa Division.

June 15, 1988.

William H. Meeks, Jr., Bradenton, Fla., for plaintiffs.

Lewis F. Collins, Jr., Dickinson, O'Riorden, Gibbons, Quale, Shields & Carlton, P.A., Sarasota, Fla., H. Hamilton Rice, Jr., Bradenton, Fla., Julius F. Parker, Jr., Parker, Skelding, McBoy & Labasky, Tallahassee, Fla., for defendants.

## ORDER ON MOTION FOR SUMMARY JUDGMENT

KOVACHEVICH, District Judge.

This cause is before the Court on motion for summary judgment, response thereto, and court-ordered joint memorandum on motion for summary judgment.

This circuit clearly holds that summary judgment should only be entered when the moving party has sustained its burden of showing the absence of a genuine issue as to any material fact when all the evidence is viewed in the light most favorable to the nonmoving party. *Sweat v. The Miller Brewing Co.*, 708 F.2d 655 (11th Cir.1983). All doubt as to the existence of a genuine issue of material fact must be resolved against the moving party. *Hayden v. First National Bank of Mt. Pleasant*, 595 F.2d 994, 996–7 (5th Cir.1979), quoting *Gross v. Southern Railroad Co.*, 414 F.2d 292 (5th Cir.1969). Factual disputes preclude summary judgment.

The Supreme Court of the United States held, in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986),

> In our view the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322, 106 S.Ct. at 2552, 91 L.Ed.2d at 273.

The Court also said, "Rule 56(e) therefore requires that nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing there is a genuine issue for trial.'" *Celotex Corp.*, at 324, 106 S.Ct. at 2553, 91 L.Ed.2d at p. 274.

This cause of action was filed January 6, 1987, and an amended complaint was later filed. The named defendants were John M. Colgate; Scott Briggs; Craig Himes; Thomas Burton, individually and as Sheriff of Manatee County; Charles B. Wells, as

Sheriff of Manatee County; and Manatee County. On April 12, 1988, this Court granted a motion for summary judgment and dismissed all defendants except for John M. Colgate. Defendant Colgate has now filed the instant motion for summary judgment. Plaintiff Janice E. Johnson has, by stipulation of the parties, been dismissed from this action. (See joint memorandum, pg. 2).

UNDISPUTED FACTUAL ALLEGATIONS

1. Plaintiff Bobby Gene Johnson is and was, at all material times, a United States citizen and a resident of Bradenton, Florida, Manatee County.

2. John M. Colgate is a United States citizen and was at all times relevant to the complaint and amended complaint, a duly appointed law enforcement official with the Sheriff's Department of Manatee County, Florida. Defendant Colgate was, at all times relevant, acting as an agent, servant, official, or employee of the Manatee County Sheriff's Department.

3. On January 2, 1985, Scott Briggs, while in his capacity as a Manatee County Deputy Sheriff, made an attempt to stop Plaintiff for a traffic infraction, which was in violation of Florida law.

4. Johnson fled from Deputy Briggs. Briggs and Deputy Craig Himes pursued Plaintiff through the public streets of Manatee County.

5. Defendant Colgate was operating a vehicle owned by the Sheriff's Department and was acting in his official capacity as Deputy Sheriff on that date. The vehicle was being operated by Colgate with the consent and authority of the Sheriff of Manatee County.

6. The official incident report of Deputy Scott Briggs states that prior to the attempted stop of the motorcyclist, Deputy Hodo told him that the operator of the vehicle lived in the area.

7. Defendant Colgate stated the following account of the incident of January 2, 1985, in his deposition of April 14, 1988:

On January 2, 1985, Colgate was working in the Selective Enforcement Unit or "Plain Clothes Division" of the Sheriff's Department Road Patrol. He came on duty approximately ten (10) minutes prior to the incident. Colgate was in the area of State Road 70 and Caruso Road, about five (5) miles northeast of the City of Bradenton. He heard a radio broadcast from the pursuing deputy stating that a marked car was in pursuit of a black male on a red motorcycle. The broadcasting deputy indicated that he had attempted to stop the motorcyclist; he did not specify the alleged offense, and, that the motorcyclist fled.

Deputy Colgate continued in the direction that he had been going, westbound on State Road 70, to the area of 33rd Street, East. At the time, he believed the fleeing motorcyclist was going in a direction away from where he was. He had not, at that point, formed an intent to assist in the pursuit. The pursuing deputy radioed for assistance. He stated that the motorcyclist was eastbound on 63rd Avenue, that he had run the red light at the intersection at 15th Street, East and 63rd Avenue, at speed in excess of 85 m.p.h. At that juncture, a second deputy indicated that he had joined the pursuit.

The second deputy radioed that the cyclist was still eastbound on 63rd Avenue, had run the traffic light at U.S. 301 and 63rd Avenue, at speeds in excess of 90 m.p.h. The radio transmissions suggested that it appeared that the motorcyclist was going to turn onto 33rd Street, North. It was at this time that Colgate advised the two pursuing deputies that he was southbound on 33rd Street from State Road 70, and that he could see for a good distance south. There was no response to Colgate's transmission.

Colgate surveyed the area and found it unpopulated, with very little obstructions, he found no one on the road behind him, and he could see red and blue revolving or flashing lights and headlights

in front of him. The other two Sheriff's vehicles were still at a considerable distance south of 58th Avenue, East, and were coming toward Colgate's vehicle. He heard a radio transmission, "he's coming at you." At about 1/8 to 1/4 of a mile north of 58th Street, Colgate had turned on his headlights, four-way flashers, grill lights, and a blue revolving light on the car dashboard, as well as his siren.

Colgate was traveling about 40 m.p.h. at the time he first saw the motorcycle and he began slowing down. His intention was to force the cyclist off the roadway and thereby terminate the pursuit before it proceeded into a highly populated area. Colgate pulled his vehicle across the center line and was slowing to a stop at an angle. As he slowed, it became obvious the motorcycle was not stopping. The motorcycle collided with the left front quarter of the Sheriff's car. At the time of collision, Colgate was attempting to stop his vehicle and attempting to lay down in his seat. The collision occurred in the motorcyclist's lane.

After the collision, Colgate exited his vehicle and found the motorcyclist unconscious. The cyclist regained consciousness very rapidly, started to move around, told Colgate he wanted his helmet off, and started trying to remove the helmet and get up.

Colgate had no intention of causing Plaintiff injury; he intended to show him that he was outnumbered and to stop his foolish actions. He did intend to force Plaintiff off the roadway and terminate the pursuit and assist in his apprehension. Colgate did not intend for his vehicle to make contact with the motorcycle.

Colgate was familiar with state law on the use of deadly force, as of January 2, 1985. It was his understanding that deadly force would not be proper to stop a fleeing misdemeanant or traffic offender. At the time of the accident, Colgate understood that the motorcyclist was fleeing to elude arrest. He was unaware of any decisions holding that use of his vehicle to stop a fleeing suspect would be a violation of the suspect's constitutional rights; he was unaware of *Tennessee v. Garner.*

8. Plaintiff Bobby Gene Johnson's deposition was taken October 28, 1987, and the following is a summary of his deposition testimony:

On January 2, 1985, he was riding his motorcycle, with the intent of going home during his lunchbreak. He approached a four-way stop, turned left and intended to turn right at the next street, which led to his home. After making the left turn, he wound his bike out, causing the front end to leave the ground. He missed his right turn; he then turned around in the road, decided not to make his turn, and continued back to the four-way intersection. A deputy in a marked patrol car was approaching the intersection from the other direction, the same direction Plaintiff had originally come from. Plaintiff turned left and the deputy followed behind him. After the deputy followed for about three (3) blocks at thirty (30) m.p.h., Plaintiff noticed the flashing blue lights. Plaintiff panicked, and fled. He thought he could outrun the car and avoid a ticket.

Through the residential areas, Plaintiff reached top speeds of 50 m.p.h., but on the less crowded roads he reached speeds of 80 m.p.h. and ran two (2) stop signs. At 33rd Street, East, he looked back and did not see or hear the pursuing patrol car. His intent was to return home, leave the motorcycle, and drive his car to work. Plaintiff turned on 33rd Street and proceeded north "at a good pace." He saw a blue car turn from Highway 70, traveling south on 33rd. Plaintiff saw no flashing lights nor did he hear a siren. The blue car suddenly turned in front of him as if making a left turn. Plaintiff was approximately seven (7) feet from the car when it turned and crossed into his lane of traffic. At the point of collision, the car's front bumper was about twelve (12) inches from Plaintiff's edge of the roadway. Plaintiff does not recall speaking to anyone after

the accident until he was in the ambulance.

9. Harry Wallace was working on the southeast corner of 33rd Street, East, and 58th Street. His deposition testimony stated:

Mr. Wallace heard a motorcycle approaching from the south, heard sirens from the south, and saw a motorcycle traveling north on 33rd, at about 50 m.p.h. Wallace then saw a light blue or green car coming south on 33rd Street. The car started making a turn across the road when the motorcycle nearly reached the car. The car moved real, real slow until the motorcycle got to the car, then he "just eased on out and hit the motorcycle." Mr. Wallace could not see any lights on the car until it started the turn and then he saw a flashing light on the dash. He did not hear a siren from the car nor see other lights.

Mr. Wallace was a football field away from the car when it started to turn and there were no obstructions to his view. The car was moving at all times prior to the collision. The collision occurred on the edge of the roadway in the motorcyclist's lane. The car did not move after the collision. The witness stated the motorcycle could have hit the car, rather than the car hitting the cycle.

10. Melissa Adams was also a witness to the incident of January 2, 1985, and was working in the same field as Mr. Wallace. In her deposition, she testified:

Ms. Adams heard sirens in the distance and saw the motorcycle traveling north on the road in front of her, about a football field away. She thought that the motorcyclist was traveling faster than the speed limit. Ms. Adams saw the car traveling south on the road, at about the same distance away. As the two vehicles approached, the car was moving; it was slowing down. The car turned across the center line. The car was slowing down and as the motorcycle went to go around it; the car was already over the center line and the car hit the motorcycle. When the motorcycle got in front of him, the car speeded up and hit him. The witness heard the car's engine rev and noticed a change in the speed.

Ms. Adams saw the figure of the driver and he continued to drive the car the whole time she watched the incident. The only light she noticed was a flashing blue light on the dash, which she saw only after the car turned toward her. The collision took place on the shoulder of the motorcyclist's side of the road.

## UNDISPUTED ISSUES OF LAW

The following represents statements of law that the parties agree are not in dispute and that represent the law of this case.

1. Mere negligence involving only a lack of due care by a state official is not sufficient to give rise to liability pursuant to 42 U.S.C. § 1983, including police actions in injuring motorists through the negligent operation of their vehicles. *Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986); *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Cannon v. Taylor*, 782 F.2d 947 (11th Cir.1986).

2. *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), was decided three months after the incident in question. This is the first United States Supreme Court case generally holding that the use of force (shooting) to stop a fleeing felony suspect, without believed probable cause that the suspect poses a significant, immediate threat of injury or death, was an unconstitutional violation of the Fourth Amendment prohibition against unreasonable searches and seizures.

3. To determine if Defendant Colgate is entitled to good faith or qualified immunity of a law enforcement officer, the Court must look to *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). *Harlow* holds that government officials performing discretionary functions are generally shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. On summary

judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law was not clearly established, an official cannot reasonably be expected to anticipate subsequent legal developments, nor could he be said to know that the law forbade the conduct not previously identified as unlawful. Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, the person who suffers injury caused by such conduct may have a cause of action. The doctrine of qualified immunity was reaffirmed and amplified in *Anderson v. Creighton*, 483 U.S. ——, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In the context of determining qualified immunity, the very act in question need not have been previously held unlawful.

## DISCUSSION

■ The first issue to be addressed is whether or not the allegations of the complaint and supporting deposition testimony support Plaintiff's contention that the actions of Deputy Colgate constitutes more than negligence and rise to a constitutional level. The claim of negligence or even gross negligence will not support a cause of action under 42 U.S.C. § 1983. The cause of action alleges more than mere or even gross negligence.

Plaintiff has asserted the intentional use of excessive force in attempting to arrest him, which can provide a basis of a 1983 action. Injuries arbitrarily inflicted by the police are constitutionally cognizable and remediable. *Jenkins v. Averett*, 424 F.2d 1228, 1232 (4th Cir.1970). One witness in this cause testified that Deputy Colgate, after turning into Plaintiff's lane of traffic increased his speed and hit the motorcycle. This is sufficient to defeat the motion for summary judgment insofar as it claims that the complaint does not state a constitutionally cognizable cause of action. Plaintiff has come forward with evidence that the action of Deputy Colgate was intentional rather that negligent and constituted use of excessive force in the circumstances of this cause of action.

The final issue is whether or not Deputy Colgate is entitled to qualified ("good faith") immunity in this cause. The Supreme Court has held that a defense of qualified immunity is defeated if the official claiming the immunity "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], or if he took the action *with the malicious intention to cause a deprivation of constitutional rights or other injury ...*" *Harlow*, 457 U.S. at 815, 102 S.Ct. at 2737. The question of qualified immunity generally turns on the "objective legal reasonableness" of the action, in the light of preexisting law, the unlawfulness must be apparent although it need not necessarily have been previously declared unlawful. *Anderson*, 483 U.S. at ——, 107 S.Ct. at 3038, 97 L.Ed.2d at 530.

■ The Court agrees with Plaintiff's memorandum of law that the state of the law was such that Defendant Colgate should have known that the use of the level of force used in this case was deadly or excessive to the circumstances of this cause of action. Plaintiff was a fleeing traffic offender and under the common law and Florida statutes the use of deadly force is not supportable, unless the misdemeanant forcibly resists arrest. *Hutchinson v. Lott*, 110 So.2d 442 (Fla. 1st D.C.A. 1959). The state of the law at the time of the incident stated that the use of any level of force, including deadly force, is justified where an officer reasonably believes it necessary to "defend himself or another from bodily harm" or when arresting an escaped or fleeing felon. Section 776.05, Florida Statutes. Defendant Colgate had no reason to believe that it was necessary to defend himself or anyone else, nor was Plaintiff a fleeing felon. Accordingly, it is

ORDERED that the motion for summary judgment be denied.