**Maurice JONES, Plaintiff,**

v.

**Walter R. KELLY, Gerald E. Morrissey and E.R. Donnelly, Defendants.**

**No. 94–CV–0185H.**

United States District Court,
W.D. New York.

Oct. 26, 1995.

---

Maurice Jones, Alden, New York, pro se.

Dennis C. Vacco, Attorney General of the State of New York, Mark R. Walling, Assistant Attorney General, Buffalo, NY, for Defendants.

## DECISION AND ORDER

HECKMAN, United States Magistrate Judge.

The parties have consented to have the undersigned conduct any and all further proceedings in this case, including entry of final judgment, in accordance with 28 U.S.C. § 636(c). Pending for decision is defendants' motion for summary judgment. For the following reasons, defendants' motion is granted.

### BACKGROUND

Plaintiff filed this action on March 14, 1994, against defendants Walter R. Kelly, Gerald Morrissey and Edward Donnelly for an unspecified amount of damages under 42 U.S.C. § 1983 (Item 1). In 1993, at the time of the incidents and conduct alleged in the complaint, the defendants were employees of the New York State Department of Correctional Services ("DOCS"). Defendant Kelly was the Superintendent of the Attica Correctional Facility, defendant Morrissey was a Classification Analyst with the DOCS Division of Classification and Movement, and defendant Donnelly was the Deputy Superintendent for Security at Attica.

Plaintiff claims that defendants placed his life in danger by transferring him to Attica in January, 1993, where he became the target of a cell fire in April, 1993 and the victim of an assault by other inmates in May, 1993 (*id.*). He also claims that Attica officials were aware of his need for protection from other inmates, based on several letters and memos he wrote to prison officials dating back to at least 1991.

By way of background, the record shows that in March, 1991, while he was confined in the Special Housing Unit ("SHU") at the Attica facility, plaintiff wrote a letter to defendant Donnelly, who was then a Corrections Captain at Attica. Plaintiff stated in the letter that, on at least two occasions in December, 1990, he requested placement in protective custody because his life had been threatened by other inmates at Attica, but

his requests were denied. He asked Donnelly to investigate the matter, and requested either transfer to another facility or continued assignment to SHU (Item 18, Ex. A).

Donnelly referred the letter to the facility's Committee for Protective Custody. Deputy Superintendent of Security Albert Hall, Sergeant Brooks and Corrections Counselor K. Hermann were the committee members who reviewed plaintiff's request for protective custody (see Ex. attached to Kelly Aff., Item 18). In a memorandum to Superintendent Kelly dated May 7, 1991, the committee recommended that plaintiff not be assigned to protective custody. The recommendation was based on a review of plaintiff's file and an interview conducted on May 6, 1991. According to the committee, plaintiff alleged that while he was in the facility's general population, two inmates verbally threatened him and robbed him of his possessions. The accused inmates denied the allegations, and plaintiff was found guilty of creating a disturbance, possession of a weapon and refusing a direct order. He received 60 days in SHU and recommended 3 months loss of good time credit. The committee found that plaintiff's reasons for his protective custody request were vague and unsubstantiated. On May 8, 1991, Superintendent Kelly denied plaintiff's request for protective custody, based on the recommendation of the committee (id.).

Meanwhile, on April 9, 1991, plaintiff wrote a letter to Deputy Superintendent Hall in which he requested assignment to "E" Block upon his release from SHU (Item 18, Ex. B). Plaintiff stated that such a placement might afford him some seclusion from the general population until he could get a transfer to another facility (id.).

Upon his release from SHU, plaintiff was assigned to "E" Block. On May 14, 1991, Deputy Superintendent Hall received a letter from plaintiff thanking him for his efforts (id., Ex. C).

On September 3, 1991, Deputy Superintendent Charles Brunelle filed an Unusual Incident Report indicating that plaintiff approached Corrections Officer Prentice on September 1, 1991 and informed him that he slipped and fell in "B" mess hall, injuring his jaw (id., Ex. D). Plaintiff was transported to Erie County Medical Center for treatment of a broken jaw and bleeding gums. The report indicates that there were no witnesses to the incident. A follow-up investigation was conducted, and all appropriate reports were submitted (id.).

On September 12, 1991, plaintiff wrote a letter to Deputy Superintendent Hall in which he stated that he was in the prison hospital with a broken jaw "as a result of the problem I relayed to you in March" (id., Ex. E). He advised Hall that he was "no longer requesting protection" because he did not feel that the Attica Correctional Facility was capable of providing it. Instead, he requested a transfer to another facility upon his release from the hospital (id.).

On November 8, 1991, plaintiff was transferred to the Auburn Correctional Facility. Although not alleged in his complaint, plaintiff stated at his deposition that one of the inmates who had previously threatened his life was transferred to Auburn at the same time, was shackled to him during the transfer, and was housed at Auburn only three cells away (Item 21 (Transcript of Plaintiff's Deposition 2/24/95), pp. 31–35). However, on November 12, 1991, plaintiff signed an interview form indicating that he had "no need for protection from anyone here at Auburn" and that "there is no threat to my life by remaining in the general population" (Ex. attached to Walling Aff., Item 18).

On May 18, 1992, Lieutenant J. Rourke filed an Unusual Incident Report in which he stated that plaintiff was treated at the Auburn facility hospital for a three-inch slash over his right eye. The report indicated that plaintiff refused voluntary protective custody and was recommended for involuntary protective custody ("IPC") because of the incident. According to Lt. Rourke's Involuntary Protective Custody Recommendation dated May 13, 1992, plaintiff stated that he received the cut when he fell.

On June 5, 1992, plaintiff was transferred from Auburn to the Wende Correctional Facility. He signed an inmate interview slip dated June 8, 1992 indicating that he had no enemies (Ex. attached to Walling Aff., Item

18). Plaintiff did not have any problems with other inmates while assigned to Wende (Item 21, p. 37).

In January, 1993, Wende became a "reception facility," and plaintiff was transferred back to Attica (*id.*). An "Initial Interview" form dated January 12, 1993 indicated that plaintiff did not request protective custody (Item 18, Ex. F).

On April 19, 1993, Sergeant P. Smith reported that plaintiff's cell had been set on fire. Sergeant Smith indicated that plaintiff claimed he had "numerous known enemies" at Attica, and had been "labeled an informant" because of previous protective custody situations at the facility (Item 18, Ex. G). Sergeant Smith offered voluntary protective custody to plaintiff, but he refused (Item 18, Donnelly Aff., ¶ 12). Smith then recommended that plaintiff be placed in IPC, and plaintiff was confined to his cell pending a hearing on the recommendation (Item 18, Ex. G). On April 25, 1993, hearing officer Captain James ordered plaintiff to be placed in IPC for his safety and for the safety and security of the facility (*id.*).

On April 29, 1993, defendant Morrissey denied the facility's request for plaintiff's transfer which was submitted pursuant to DOCS Directive No. 4948.[1]

On May 24, 1993, an inmate misbehavior report was filed by Corrections Officer R. Piazza stating that plaintiff was involved in a fight with eight other inmates during morning meals in the IPC unit (Item 18, Ex. H). As a result of this incident, plaintiff was treated at the facility hospital for several superficial lacerations and abrasions. He was charged with violating institutional rules of conduct pertaining to fighting (Rule 100.13, 7 N.Y.C.R.R. § 270.2(B)(1)(iv)) and refusing a direct order (Rule 106.10, 7 N.Y.C.R.R. § 270.2(B)(7)(i)) (*id.*). At a hearing on May 27, 1993, plaintiff was found guilty of these charges and was assessed a penalty of 45 days in SHU and 45 days loss of phone privileges (*id.*).

On May 27, 1993, plaintiff wrote a letter to defendant Donnelly, then the Deputy Superintendent of Security at Attica, informing him of the April 19, 1993 fire and the May 24, 1993 fight in the IPC unit. Plaintiff informed Donnelly that he planned "to sue Attica," and he requested a transfer to another facility (Item 18, Ex. I). On June 2, 1993, Donnelly responded by memorandum informing plaintiff that "[i]nmates assigned to I.P.C. status are automatically submitted for transfer. However, you can still send a note to your counselor requesting a transfer" (*id.*).

On July 8, 1993, plaintiff was released from SHU. On that date, Lieutenant R. Cooks recommended IPC placement based on plaintiff's refusal to sign himself into voluntary protective custody (Item 18, Ex. J). As a result of this recommendation, plaintiff was placed in IPC until July 22, 1993 (*id.*, Ex. K).

On August 3, 1993, plaintiff was placed in administrative segregation based on the recommendation of Lieutenant R.K. James. Lt. James' recommendation was made upon receipt of a letter dated July 30, 1993 from Prisoners' Legal Services staff attorney Joseph L. Gerken (*id.*). In a letter dated August 6, 1993, defendant Donnelly wrote to Mr. Gerken advising him that plaintiff had been placed in administrative segregation "for his safety and the safe secure operation of [the] facility," and that plaintiff's transfer request was under review (*id.*).

On August 25, 1993, defendant Morrissey authorized plaintiff's transfer from Attica to the Clinton Correctional Facility, effective September 23, 1993 (Morrissey Aff., ¶ 7, Item 18).

On March 14, 1994, plaintiff filed this action. His only claim is that "Attica's administration" (specifically, defendants Kelly, Morrissey and Donnelly) knowingly placed his life in danger in January, 1993 by transferring him back to Attica, where his cell was set on fire in April, 1993, and by assigning

---

1. Directive No. 4948 provides, in relevant part: Consistent with the Department's policy of providing appropriate programming for inmates, any inmate, upon assignment to Protective Custody Status, will be evaluated for transfer to a facility where he or she may be appropriately programmed in general population . . .
Directive No. 4948, Protective Custody Status, ¶ III(A).

him to IPC, where he was assaulted by other inmates in May, 1993 (*id.*).

On May 17, 1994, defendants moved to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to allege their personal involvement in any specific constitutional violation (*see* Items 6 & 7). By memorandum and order dated June 29, 1994, the district court denied defendants' motion (Item 9). On July 12, 1994, defendants answered the complaint and asserted several affirmative defenses (Item 10).

On June 29, 1995, after document discovery and the taking of plaintiff's deposition, defendants filed a motion for summary judgment (Items 18–20). Plaintiff filed his response to the motion (Items 26, 27, and 28), and argument was heard by the court on October 12, 1995. What follows is the court's ruling on defendants' motion.

## *DISCUSSION*

### I. Summary Judgment.

■ Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.,* 933 F.2d 162, 166–67 (2d Cir.1991), and must give extra latitude to a *pro se* plaintiff. *McDonald v. Doe,* 650 F.Supp. 858, 861 (S.D.N.Y.1986).

■ A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., supra,* 477 U.S. at 248, 106 S.Ct. at 2510; *see Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

Once the moving party has met its burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a "metaphysical doubt" concerning the facts, or on the basis of conjecture or surmise. *Bryant v. Maffucci, supra* (citing *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986)).

### II. Plaintiff's Eighth Amendment Claim.

■ The eighth amendment's prohibition against cruel and unusual punishment includes an inmate's right to be protected from violence at the hands of other inmates. *Farmer v. Brennan,* —— U.S. ——, ——, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811, 822 (1994). In *Farmer,* the Court set forth a two-part standard for determining whether this right has been violated, as follows:

> First, the deprivation alleged must be, objectively, "sufficiently serious...." For a claim (like the one here) based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.... The second requirement follows from the principle that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." To violate the Cruel and Unusual Punishments Clause, a prison official must have a sufficiently culpable state of mind." In prison-conditions cases that state of mind is one of "deliberate indifference" to inmate health or safety....

*Farmer v. Brennan, supra,* —— U.S. at ——, 114 S.Ct. at 1977, 128 L.Ed.2d at 823 (citations omitted).

The Court explained that prison officials might successfully defend against a charge of deliberate indifference to an inmate's safety by showing that "they did not know of the underlying facts indicating a sufficiently substantial danger" to the inmate, "or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexis-

tent." *Farmer, supra* at ——, 114 S.Ct. at 1982, 128 L.Ed.2d at 830.

In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted. A prison official's duty under the Eighth Amendment is to ensure "reasonable safety," a standard that incorporates due regard for prison officials' "unenviable task of keeping dangerous men in safe custody under humane conditions." Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.

*Id.* at ——, 114 S.Ct. at 1982–83, 128 L.Ed.2d at 830.

■ Thus, a prison official may be held liable under the Eighth Amendment for failing to protect inmates from harm "only if he [or she] knows that inmates face a substantial risk of serious harm *and* disregards that risk by failing to take reasonable measures to abate it." *Id.* at ——, 114 S.Ct. at 1984, 128 L.Ed.2d at 832 (emphasis added); *see also Dexter v. Thompson,* 1995 WL 495072 (W.D.N.Y. August 18, 1995); *Muhammad v. Sielaff,* 1995 WL 459244 (S.D.N.Y. August 3, 1995). As stated by the Supreme Court: "To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety.... It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the [eighth amendment]." *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986); *see also Dexter v. Thompson, supra,* 1995 WL 495072 at *5.

■ In this case, the evidence shows that plaintiff faced substantial risk of serious harm in Attica's general population. In addition, the record establishes that Attica officials knew or should have known, at least by March, 1991, that the risk to plaintiff's safety was substantial. However, under *Farmer* and *Whitley,* this does not end the "deliberate indifference" inquiry. The court must

also assess whether the record establishes that defendants disregarded the substantial risk to plaintiff's safety by failing to take reasonable measures to abate it.

In this regard, the record demonstrates that even though the risk of harm was substantial, and even though prison officials had knowledge of the risk, timely and reasonable measures were taken to investigate and address plaintiff's concerns for his safety. In response to plaintiff's March, 1991 letter campaign for protection from his enemies in the facility, Deputy Superintendent Hall authorized and conducted a committee review of the underlying facts. Finding plaintiff's allegations of a life-threatening condition vague and unsubstantiated, the committee recommended denying protective custody. Hall forwarded this recommendation to defendant Kelly, who accepted it.

Meanwhile, upon his release from Attica's SHU in May, 1991, plaintiff was assigned to the "E" Block. This was a reasonable response to his concerns for his safety, as he acknowledged in a letter to Hall thanking him for the assignment.

Plaintiff was still housed in "E" Block in September, 1991 when his jaw was broken in the "B" mess hall incident. He reported that he slipped and fell. There were no witnesses to the incident. In his letter to Hall written while he was recovering in the facility hospital, plaintiff indicated that he wanted a transfer and that he was no longer interested in protective custody.

Plaintiff was transferred to Auburn in November, 1991. He claims that his enemy was transferred to Auburn at the same time, and that this inmate was shackled to him during the transfer. However, the complaint does not contain any allegations pertaining to this incident. In addition, there is no evidence in the record to suggest that any of the named defendants participated in this incident in a personal or supervisory capacity. *See Williams v. Smith,* 781 F.2d 319, 322 (2d Cir.1986).

Moreover, the record shows that after his intake interview at Auburn, plaintiff signed a form stating that he had no need for protection and did not feel that his life would be

threatened in the general population. In the absence of any facts to indicate that any of the defendants "completely disregarded or ignored plaintiff's safety" by transferring him to Auburn—the very accommodation he sought—plaintiff "cannot provide the subjective component of deliberate indifference" necessary to his claim in this regard. *Smith v. Fiedler,* 867 F.Supp. 832, 835 (E.D.Wis. 1994) (citing *Farmer, supra; Helling v. McKinney,* 509 U.S. 25, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)).

Upon his transfer back to Attica in January, 1993, plaintiff once again did not request protective custody. In fact, after the fire in his cell in April, 1993, plaintiff refused Sergeant Smith's offer of voluntary protective custody. Instead, on Smith's recommendation, plaintiff was placed in involuntary protective custody pending a hearing. The hearing officer ordered plaintiff to remain in IPC "for [plaintiff's] safety and for the safety and security of the facility" (Item 18, Ex. G).

■ In addition, defendant Morrissey's April, 1993 denial of plaintiff's transfer under the "automatic" transfer evaluation provision of DOCS Directive No. 4948, Protective Custody Status, ¶ III(A) (*see* footnote 1, *infra* ), does not subject Morrissey to § 1983 liability in the absence of any proof that he deliberately, rather than negligently or inadvertently, disregarded a substantial risk to plaintiff's safety. *Dexter v. Thompson, supra,* 1995 WL 495072 at *5 (record provided no reasonable ground to infer deliberate indifference as opposed to negligence or mistake); *see also Banks v. Mannoia,* 890 F.Supp. 95, 99 (N.D.N.Y.1995) (plaintiff's burden of proving constitutional violation must be carried in the context of prison officials' broad discretion of prison officials to order the transfer of an inmate).

Finally, plaintiff has failed to show that Attica officials' deliberate indifference resulted in the May 24, 1993 fight involving plaintiff and eight other inmates. At most, this incident suggests negligence on the part of prison officials in allowing plaintiff to interact with other inmates while he was still on IPC status, which is an insufficient basis for § 1983 relief. *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Dexter v. Thompson, supra,* 1995 WL 495072 at *5; *see also* DOCS Directive No. 4948, ¶ IV(C)(1) ("Inmates in Protective Custody Status will be afforded the opportunity to participate in two meals per day outside of their cell").

In summary, the evidence in the record before the court establishes that defendants and other prison officials took appropriate measures at every reasonable opportunity to ensure plaintiff's safety under the circumstances of his incarceration at Attica. Plaintiff therefore cannot meet his burden on this motion to come forward with enough evidence to establish that defendants deliberately disregarded or ignored his safety, an element essential to his case and on which he bears the burden of proof at trial. Consequently, plaintiff is unable to make the showing of culpability on the part of prison officials required under the analytical framework of *Farmer v. Brennan* and *Whitley v. Albers,* and summary judgment in favor of defendants is appropriate.[2]

### CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment (Item 18) is granted, and the case is dismissed. The Clerk of the Court is directed to enter judgment in favor of defendants.

**SO ORDERED.**

---

[2]. Defendants also move for summary judgment on the ground of qualified immunity. Because I find that defendants are entitled to summary judgment on the issue of their § 1983 liability under the eighth amendment, I do not find it necessary to address the qualified immunity issue. *See Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).