| ■,SAUNDERS, Judge.
This 'matter arises from a motor vehicle stop executed by then Calcasieu Parish Deputy Lennis Landry, hereinafter “Landry,” on driver Jason Paul Ortego, hereinafter “Jason,” and passenger Nicole Ann Daigle, hereinafter “Nicole.” Jason and Nicole brought a civil action alleging that during the stop and the events following, Landry violated their first, eighth and fourteenth amendment rights of the United States Constitution, and under state law, Jason and Nicole brought claims of false imprisonment, intentional tort and malicious prosecution. Jason and Nicole also sued Landry’s employer, Calcasieu Parish Sheriff Wayne McElveen, hereinafter “McElveen.” Finding in favor of Jason, a jury awarded him $30,000.00 for | ^compensatory damages and $50,000.00 for punitive damages against Landry. Against McElveen, Jason was awarded an additional $20,000.00 for compensatory damages and $150,000.00 for punitive damages. The jury found Nicole suffered no infringement of her constitutional rights. We affirm.

FACTS

At the end of a work day, on the night of November 16, 1994, Jason left his workplace, picked up Nicole and then went to a Hardee’s Restaurant to get a malt and ice cream. After picking up the ice cream, Jason and Nicole returned to the vehicle Jason was driving and proceeded east on Broad Street. Just before reaching the intersection of Broad Street and Highway 14, Jason alleges another vehicle emerged from a gas station into their lane of travel. Jason claims that he was forced to swerve his vehicle to miss the automobile. After observing the swerving motion made by Jason’s vehicle, Landry pulled Jason over.
The following sequence of events were brought out at trial: Jason stepped out of his vehicle, with his malt in hand, approached the officer and asked why he was being stopped to which Landry allegedly responded with belligerence. Jason then offered the officer his license with the intent of returning to his vehicle to retrieve his registration and proof of insur- *615 anee. Before he could do so, Jason claims Landry slapped his malt out of his hand. After looking in his vehicle, Jason could not find his proof of insurance and so he returned with only his registration and license. Landry became angry and began yelling and pushing Jason. Nicole became upset and asked Landry to stop his aggressive behavior. Landry allegedly grabbed Jason by the neck, choked him, pushed him on the ground, picked him up off the ground with a choke hold and then .smashed Jason’s head onto the trunk of Jason’s automobile. Finally, with the help of another officer, Landry handcuffed Jason and placed him in the back of the Sheriffs unit. Nicole claims Landry then dragged her across the front seat of | sthe vehicle and pulled her out by her neck and hair. She was then handcuffed. Landry searched Nicole’s purse while waiting for the wrecker to arrive.
Jason and Nicole were arrested and taken to the Parish Jail. Jason alleges that at some point between being taken to the Sheriffs station and being incarcerated, Landry struck him on the chin with a key chain and searched his person.
A trial by jury ensued, and a judgment was rendered on June 18, 1998, and signed on August 12, 1998. The jury found both Landry and McElveen, with evil intent, deprived Jason of his constitutional rights which was the legal cause of pain, suffering, mental anguish or emotional distress suffered by Jason; the jury also found Landry falsely imprisoned or arrested, battered, assaulted or maliciously prosecuted Jason. The jury awarded Jason $80,000.00 in compensatory damages for pain, suffering, mental anguish or emotional distress against Landry along with another $50,000.00 in punitive damages against the same. Further, the jury awarded Jason $20,000.00 in compensatory damages for pain, suffering, mental anguish or emotional distress, plus $150,-000.00 for punitive damages against McEl-veen.
The jury found Nicole’s constitutional rights were not violated. The trial judge assigned Nicole one-half of the court costs, and Landry and McElveen with the remaining half. Motions for a judgment notwithstanding the verdict and/or new trial were filed and denied.

LAW AND ANALYSIS

I. Standard of Review
Moresi v. Louisiana Dept. of Wildlife and Fisheries, 567 So.2d 1081, 1084 (La.1990), provides what a plaintiff must show for a successful § 1983 claim, to-wit:
To recover under Sec.1983, a plaintiff must allege and prove two essential elements. First, a plaintiff must show that conduct occurred under color of state law. Second, a plaintiff must show that this conduct deprived him or her of a right, privilege or immunity secured by the Constitution or a law of the United States.
|4Such are factual questions to be reviewed on appeal, as set out by Rosell v. ESCO, 549 So.2d 840, 844 (La.1989):
It is well settled that a court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong,” and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.
Furthermore:
[T]he issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfin-der’s conclusion was a reasonable one. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder’s, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony.
*616 Stobart v. State, Through Dep’t of Transp. and Dev., 617 So.2d 880, 882 (La.1993).
II. Nicole’s First Assignment of Error
On appeal, Nicole asserts the jury erred when it found that neither Landry nor McElveen violated her civil rights under both 42 U.S.C. § 1983 and under state tort law. The civil rights statute, 42 USC § 1983 provides:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer’s judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.
Nicole argues the jury erred when it failed to find in her favor, despite the compelling evidence to the contrary and despite its finding Jason’s rights violated. Nicole claims Landry assaulted, battered, falsely imprisoned, used excessive force, Land maliciously prosecuted her. Both Nicole and Jason gave testimony detailing the events of that night, including testimony indicating that her rights may have been abused.
Nicole testified Jason swerved to dodge a car that moved into their lane of traffic; Jason was not speeding and had not run any red lights. She witnessed Landry knock the cup out of Jason’s hand. She explained that when Jason returned to the vehicle, she helped him “desperately” search for his papers. When Jason returned to Landry, she testified Landry pushed Jason and then put him in a headlock against the car. Nicole’s description of the events that followed were consistent with that of Jason’s. She described her fright and fear that Jason would be hurt or killed, and she remembered trying to waive down traffic and calling to the people watching from The Super Bar to get help. Nicole explained that Landry told her to get back in the car, which she did. Nicole described the following:
He said-he just said, “Get out,” and so I knew immediately I better get out, you know. I mean-so, I grabbed the rest hold when I was getting out, and as I was going out to the door he grabbed me by the back of my hair and by my neck, and I’m not sure if it went around or whatever, but I know there was a hand on my hair and a hand around my neck and he pulled me out of the car.
Nicole concluded her description of events by noting that she was handcuffed, taken to jail, never read her rights, held for about an hour, cited for resisting arrest and ultimately had to hire an attorney and appear in criminal court for charges that were eventually dropped.
At trial Jason detailed the events of the stop: he got out of his car with a malt in his hand, he asked Landry what the problem was, Landry cursed at him, hit his ice cream out of his hand and told Jason to get all of his paperwork out of his car. When Jason returned without proof of insurance, Landry became angry. After testifying that |fithere was no warning and that he did nothing to provoke Landry’s action, Jason described how Landry grabbed him:
I think at the first point he did have it in the head lock, and then he grabbed the back of my head and slammed it onto the trunk, and then I think from there maybe a sleeper hold was involved where he puts his forearm underneath my chin and puts another hand above *617 my forehead and squeezes, and then he picked me up by the throat with his hand at one time, and scratched me all up pretty bad. It was just a ring around. It was all the way from one end of the car from one side by the road to the other side by the trailer; closest to the trailers is when all of that happened.
Jason recalled that as he was being handcuffed, Nicole was in the street yelling, trying to get someone to help or stop. He also explained that Landry grabbed Nicole by her hair and neck, drug her out of the vehicle and then handcuffed her. Jason explained that when he was brought to jail, he was searched. A pocket knife was found on him; he explained that he used it to cut open boxes when he worked at Pizza Hut. Jason detailed the following events at the jail:
After I went into the break room and he had searched me and everything I think he went somewheres (sic) else and then he came back and asked me if I had been in trouble with a police officer or anything and I told him I just had a ticket and he was walking on his way out again and that is when he hit me with a key chain. It’s a long slender metal. It’s not real thick, but it’s long and slender, rectangle, and he hit me underneath my chin with the key chain as he walked out.
Jason testified that he was still handcuffed at this time. When Jason was finally released, he went to the emergency room where it was found that he had contusions to his head; he had to wear a neck brace. Jason explained that as a result of the incident, he had several criminal charges pending against him. As a result, the National Guard would not take him until the matter was resolved, delaying his only means of attending college.
Regarding Nicole’s allegations, Landry and Officer Jason Derise gave conflicting testimony evidencing that Landry’s actions towards her were reasonable. Landry explained that Jason resisted arrest, making it difficult to handcuff him, and 17that while he was trying to gain physical control over Jason, Nicole jumped out of Jason’s car and charged at Landry, yelling and screaming. He testified that he used Jason “as a shield” to keep Nicole off of him. Landry testified that Corporal Derise arrived early on and ultimately helped Landry handcuff Jason, after which Derise left; Landry stated that Derise had no interaction with Nicole. Landry testified that he then asked Nicole to get out of Jason’s vehicle and then walked her to the front seat of the patrol unit. He testified that there was “not a soul out there” when asked whether anyone observed the incident.
Officer Jason Derise testified that during the short time he was at the scene, he was certain that he saw Nicole step out of the car she was in several times and that she was told to get back in the car. He testified Nicole was in Jason’s vehicle when he arrived. After Jason was in Landry’s vehicle, Derise stated that he was present when Landry asked Nicole to exit the car she was in, which she refused to do. Inconsistent with Landry’s testimony, Derise explained that he was present when Landry got Nicole out of Jason’s car. He described Landry’s actions as “placing one hand on the back of her neck, guiding her out of the car.” Derise denied having seen Landry force Jason’s head into the trunk of the car or take him to the ground. The record indicates Derise was at the scene for only two minutes.
The jury concluded that both Landry and McElveen violated federal and state law as to Jason, but not as to Nicole. The records discloses a conflict in testimony regarding the events surrounding Nicole’s arrest. The basis of the jury’s judgment denying Nicole’s allegations was necessarily based on evaluations of the credibility of the testimony and reasonable inferences of fact which we cannot overturn absent a showing of manifest or clear error; finding none, we affirm.
*618 III. Nicole’s Second Assignment of Error
IsNicole argues on appeal that the trial judge erred in assessing to her one-half of all court costs associated with the proceedings. We disagree. In light of the foregoing discussion denying Nicole’s claim that her state and federal rights were violated, and in light of the great discretion given courts in assessing court costs, we affirm the 50% assessment against Nicole for costs of court at trial. Cajun Elec. Power Co-op. v. Owens-Corning Fiberglass Corp., 616 So.2d 645 (La.1993).
IV. Defendants ’ Assignment of Error

A. McElveen

McElveen assigns as error the jury’s finding him liable under 42 U.S.C. § 1983 for a violation of Jason’s civil rights, and McElveen argues that the jury erred when it found that he was not entitled to qualified good faith immunity. “The affirmative defense of qualified immunity from suit is available to all governmental officials in § 1983 actions,” and “[t]he governmental official has the burden of proving the defense of qualified immunity.” La. Farms v. La. Dep’t of Wildlife, 95-845 (La.App. 3 Cir. 10/9/96); 685 So.2d 1086, 1093. (Citations omitted.)
In Moresi, 567 So.2d at 1084-85, the court noted, “[t]he decisions of the Supreme Court and the circuits demonstrate that the qualified immunity test covers all state and local government officers at all levels of responsibility with the exception of those who have absolute immunity.”
“The standard applicable in determining whether qualified immunity should be recognized is ‘objective reasonableness.’ ” Breaux v. Jefferson Davis Sheriff's Dep’t, 96-944 (La.App. 3 Cir. 2/5/97); 689 So.2d 615, 617, citing Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). See also Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In La. Farms v. La. Dep’t of Wildlife and Fisheries, 95-845 (La.App. 3 Cir. 10/9/96); 685 So.2d 1086, 1094, units denied, 97-0507 (La.4/4/1997); 692 So.2d 422, this court has explained:
l9It should not be surprising ... that our cases establish that the right the official is alleged to have violated must be “clearly established” in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has been held unlawful ... but it is to say that in the light of pre-existing law the unlawfulness must be apparent.
(Citations omitted.)
McElveen argues under Hinshaw v. Doffer, 785 F.2d 1260 (5th Cir.1986), that he is not liable since there is no connection between his failure to train or supervise Landry and the incident that occurred on November 16, 1994. The jury found McElveen intentionally deprived Jason of his constitutional rights while acting under “color of state law.” In searching for manifest error, we consider whether the record supports a finding that this official acted in a way that a reasonable official would understand violated Jason and whether there exists a causal connection between his actions and the harm Jason suffered. A series of witnesses testified to evidence not only McElveen’s fault in negligently allowing Landry to continue patrol duty but also that Landry did, in fact, commit several state and federal law violations.
The record indicates that Landry had a history of aggressive behavior while on duty; citizens and fellow officers had complained of his behavior prior to this incident. Tommy Hebert, Deputy Sheriff for the Calcasieu Parish Sheriffs Department, hereinafter “CPSO,” was in charge of internal affairs at the time of the November 16, 1994, incident, and he testified that on *619 several occasions he had investigated Landry regarding complaints from the public and from coworkers. Hebert’s job was to investigate complaints and then present it to the chief deputy and to the sheriff. Hebert had received a complaint against Landry for use of excessive force during an incident referred to during trial as the “Mossville incident.” Hebert explained that he found that complaint unsubstantiated; he admitted, however, the scope of that Iminvestigation covered only the complaining parents of the juvenile arrested and Landry himself — not Officer Larocca, who testified at trial that he believed Landry had slapped one of the handcuffed juveniles. In the present matter, Hebert explained that, initially, he again found complaints about Landry to be inconclusive; this investigation extended to talking to Landry and to reviewing a report made by a city police officer who had assisted Landry that night. Hebert never spoke to either Jason or Nicole. After several supervisors came in with complaints about Landry, Hebert only then made a report to Chief Spees concerning the complaints about Landry. As a result of that report, Landry was taken off patrol duty.
Three night supervisors testified that several of Landry’s fellow officers had complained about Landry and indicated that they did not want to work with him for fear of litigation arising from Landry’s behavior. Deputy Billy Wayne McIntosh, assistant night shift operator at CPSO and deceased at the time of trial, explained in his deposition that three unidentified officers came to' him to express their concerns, complaints and fears about working with Landry. Deputy Michael Hayes, also assistant night supervisor, testified to the same. Hayes also testified that he witnessed instances where Landry was summoned by dispatchers to back up officers and Landry failed to do so. Essentially, Landry’s co-workers were afraid his behavior would get them in trouble. Deputy Carlton Pitre, night supervisor at CPSO, confirmed that while no one wanted to make a formal statement against Landry, they did not want to ride with him either. Pitre acknowledged having received complaints about Landry following the June 1994 “Mossville incident” before the present matter at issue occurred.
Deputy Craig Larocca of the CPSO rode with Landry during the “Mossville incident.” At trial, Larocca described Landry’s actions in Mossville. He testified that Landry had stopped the patrol car, gotten out of the vehicle and opened the back door In of the unit. Larocca explained that he then heard a noise which sounded like Landry slapping the handcuffed juvenile who was sitting in the back seat.
Testifying to observations made on the night in question, Karim Williams, Jason’s classmate, stated that he recognized Jason’s vehicle stopped by a sheriffs unit as he was driving by on Broad Street. He explained:
As I was driving I stopped because I noticed it was Jason, and so I stopped. Traffic was behind me. He was handcuffed and he was getting shooken (sic) up and slammed on the ground and the ol’ boy threw him on the hood of the car. When I turned around I was going west on Broad. I turned around and came back east. He was already sitting in the cop car and the cop was talking to his girlfriend.
In court, Melissa Lou Bourque testified that, on November 16, 1994, she witnessed the events of the present matter, which took place in front of her place of employment, The Super Bar lounge. Bourque testified that she saw Landry curse at Jason and knock his ice cream out of his hand. Bourque explained she had stepped away from the door for a moment but returned to view the following:
That is when they had more cop cars pull up and they had him out of the car handcuffing him. They were jerking him around by his collar, still cursing him, and after they handcuffed him they had him by the back of his shirt beating *620 him in the car; and the young lady that was with him had got out, and you could tell she was very upset, crying and everything, and asking what was going on, please don’t hurt him, and the officer fussed at her and told her to get back in the car, it wasn’t none of her business.
She further explained that the officer “had him in the back of his shirt beating his head in the car like.” Bourque recalled that she saw Jason exhibit no aggressive behavior.
Paul Pollard also witnessed the events of November 16, 1994, from The Super Bar lounge. He saw an officer slamming a young boy on the hood of a car, “like a rag”; he testified that the officer had control at all times and that Jason did not appear to resist him. Pollard stated that several officers were around, watching the one officer handle Jason. He testified that he called about the incident but was told, “You need to stay out of this. There’s more than meets the eye.” Pollard opined that even if the ^person he saw being arrested was insane, such manhandling would not have been appropriate.
Landry’s testimony at trial very much conflicted with that of Jason’s and the other witnesses. Landry explained that he first noticed Jason’s vehicle traveling at a high rate of speed, nearly colliding with a car and partially leaving the roadway. He then proceeded to follow the car and execute a stop. Landry explained that he gave several verbal commands for the driver to get out of the vehicle to which he received no reply. After giving a louder command and a gesture, Landry stated that Jason exited his car and approached him, walking at a rapid pace and holding a cup in his hand. Landry testified that Jason cursed at him. Landry stated he identified himself, stated his reasons for the stop and asked for his papers. He noted that Jason braced up to him several times. When Jason returned from his car without his proof of insurance, Landry testified that Jason became angry and belligerent. Landry explained that Jason braced up to him again and became loud. After Jason braced up to Landry a couple of times, it was then that Landry knocked the cup out of Jason’s hand with his flashlight. At this time, Landry recalled that Nicole had her head out of the car window, yelling and cursing at him. Landry described the arrest stemming from Jason’s continued attempt to put his hands in his pocket. Landry explained:
He put his hands in his pocket several times. I asked him not to do that, and at one point I told him he was under arrest, and I went to grab his hand out of his pockets after he refused to take it out of there and he pulled away from me. So, at that point I tried to position myself behind Jason so I could have some kind of control of him and try to maintain, you know, some kind of control, try to keep his hands from going in his pockets and to try to effect an arrest.
Landry stated, after being transferred to jail duty, he was fired for absenteeism. He did not know why he was taken off patrol duty.
A review of the above reveals sufficient evidence and testimony upon which members of a jury might reasonably disagree. We, therefore, find no clear error in |13the jury’s conclusions, both that the Calcasieu Parish Sheriffs Office had been apprized well before this incident that Landry was known to actively exhibit aggressive and potentially abusive behavior while on duty and that Landry violated Jason’s state and federal rights on the night of November 16, 1994. Each of the assistant night supervisors attested to the complaints from fellow officers about Landry and the requests not to be assigned duty with him. Further, complaints from the public were not only not fully investigated, they were not appreciated for being what they were-at the very least, warning signs that something was seriously wrong with Landry’s professional behavior. The evidence as a whole takes on a tenor of clear and knowing neglect by official power where it failed *621 to remove Landry from patrol duty. Absent McElveen’s failure to supervise Landry, the incident of November 16, 1994, would not have occurred. We find no manifest error in holding McElveen responsible for his failure to take action to prevent Landry from exposing Jason to such abuse. We, therefore, affirm the jury’s finding that McElveen was not protected by qualified immunity and is liable for compensatory damages suffered by Jason.
McElveen argues that the jury manifestly erred when it awarded, what he argues is, duplicative compensatory damages against him in favor of Jason. Further, McElveen assigns as error the jury’s award of punitive damages against him and that the amount of $150,000.00 for the same is abusively high. “Evaluation of a personal injury award is extremely difficult. The demeanor of the witnesses, the believability of the injured party’s experience, and the medical evidence presented are the essentials in a juror’s resolution of quantum.” Roy v. Commercial Union Insurance Co., 486 So.2d 251, 254 (La.App. 3 Cir.1986). La.Civ.Code art. 2324.1 provides that “[i]n the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury.”
|uTo overturn a jury’s quantum verdict on appeal, appellant has the burden of showing that the award exceeds the much discretion given to the trier of fact.... The issue is whether or not the jury award for this particular injury is a clear abuse of the fact finder’s “much discretion.”
Toups v. T.G. & Y. Stores Co., 488 So.2d 296, 298 (La.App. 3 Cir.1986).
Further, we note that punitive damages are recoverable under § 1983 “when the defendant’s conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.” Booze v. City of Alexandria, 94-0763 (La.1994); 637 So.2d 91, 92, citing Smith v. Wade, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983).
There is no indication that the compensatory award is duplicative; the jury merely apportioned the award as it deemed appropriate. In the absence of any clear abuse of the factfinder’s discretion, we must defer to its judgment and affirm the jury’s award. Regarding punitive damages, as indicated earlier in this opinion, the record clearly establishes that McElveen’s belated action of removing Landry from patrol duty after this incident, well after a series of complaints were received from fellow officers and the public, does little to absolve him from the violations suffered by Jason. Too much information, investigated or not, was available to indicate that Landry was a risk to the public. Particularly, we note the inexcusably dangerous opportunity for abuse created by the CPSO’s decision to let Landry ride patrol alone rather than investigate and resolve the complaints brought against him. The “callous indifference” measure is readily met in this case, and we affirm the jury’s award of $150,000.00 in punitive damages against McElveen in favor of Jason.

B. Landry

Landry argues the awards against him of $30,000.00 for compensatory damages and $50,000.00 for punitive damages was abusively high. We find no such error and, again, we defer to the factfinder’s “much discretion.” Jason, the subject of Landry’s h ¡¡intentional malice, was physically manhandled, arrested, brought to jail, visited an emergency room, and made the subject of criminal proceedings-all resulting from Landry’s abuse of official power. We find ample grounds for both the compensatory and punitive damages awarded by the jury.

DECREE

Therefore, in light of the foregoing analysis and discussion, we affirm the jury’s *622 compensatory damages awarded to Jason, $30,000.00 against Landry and $20,000.00 against McElveen, and punitive damages awarded to Jason, $50,000.00 against Landry and $150,000.00 against McElveen. We affirm the jury’s denial of Nicole’s claims, and we affirm the 50% assessment of trial court costs against her. Costs of appeal are to be equally divided between Landry and McElveen.
AFFIRMED.