MELLOY, Circuit Judge,
concurring and dissenting.
I respectfully dissent because I believe the district court properly denied qualified immunity to officers McCaskey and Rogers. I concur in the majority’s affirmance of the dismissal of the remaining defendants.
As stated by the majority, we undergo a two-step process when we review a denial of qualified immunity. At the outset, we determine whether the facts as asserted by the plaintiff “show the officer’s conduct violated a constitutional right.” Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If the answer is no, that ends the inquiry. If the answer is yes, we go on to determine “whether the right was clearly established.” Id. The test for deciding whether a right was clearly established is “whether it would be clear to a reasonable officer that his [or her] conduct was unlawful in the situation he [or she] confronted.” Id. at 202, 121 S.Ct. 2151. “This inquiry must be undertaken in the ‘proper sequence.’ ” Littrell v. Franklin, 388 F.3d 578, 582 (8th Cir.2004) (quoting Saucier, 533 U.S. at 200, 121 S.Ct. 2151).
An appeal of a denial of qualified immunity does not concern “the correctness of the plaintiffs version of the facts, nor even ... whether the plaintiffs allegations actually state a claim.” Mitchell v. Forsyth, 472 U.S. 511, 528, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Our analysis is limited to “a question of law: whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions.” Id.; see also Behrens v. Pelletier, 516 U.S. 299, 306, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996); Johnson v. Jones, 515 U.S. 304, 311, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995); Nebraska Beef v. Greening, 398 F.3d 1080, 1082-83 (8th Cir.2005) (discussing the jurisdictional limits prescribed in Mitchell, Johnson, and Beh-rens ).
Thus, our task is to ask, first, “[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer’s conduct violated a constitutional right.” Saucier, 533 U.S. at 201, 121 S.Ct. 2151. I believe McClendon clears this first hurdle easily. McClendon alleges that officers intentionally exceeded the scope of the warrant by seizing healthy horses. If this allegation is true, then the officers’ conduct violated McClendon’s constitutional rights. Audio Odyssey, Ltd. v. Brenton First Nat. Bank, 245 F.3d 721, 736 (8th Cir.2001) (“A seizure of property that is unsupported by a warrant or other court order is presumptively unreasonable within the meaning of the Fourth Amendment.”). Assuming McClendon’s version of the facts is correct, as we must, she has “show[n] the officer’s conduct violated a constitutional right,” Saucier, 533 U.S. at 201, 121 S.Ct. 2151, and we move on to the second part of the inquiry.
At one point, the majority appears to recognize the initial inquiry is limited in this way. (Majority Opinion at 515 (“In the context of a Fourth Amendment case alleging an unreasonable seizure, the initial analysis simply entails (1) an examination of the text of the warrant, (2) an examination of the Defendants’ conduct, and (3) a determination as to whether that conduct exceeded the terms of the warrant.”).) However, the opinion goes on to discuss at length whether the horses were in fact outside the scope of the warrant, *520 various statements made about the horses at various times, and the likely levels of knowledge the individuals involved had about equine health. In my view, much of the analysis done by the majority is inappropriate under the first prong of the qualified immunity analysis, which is confined to determining whether a constitutional violation could be shown if all the facts, as presented by the plaintiff, are true.
Our second task is to determine whether a reasonable officer would know the seizure of the horses was unlawful, “in light of clearly established law and the information the searching officers possessed.” Anderson v. Creighton, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). At the summary judgment stage, the burden of proof is on the moving party, so the party seeking immunity must establish the relevant predicate facts. Pace v. City of Des Moines, 201 F.3d 1050, 1056 (8th Cir.2000). “Once the predicate facts are established, the reasonableness of the official’s conduct under the circumstances is a question of law.” Tlamka v. Serrell, 244 F.3d 628, 632 (8th Cir.2001); accord McVay ex rel. Estate of McVay v. Sisters of Mercy Health System, 399 F.3d 904, 908, 2005 WL 497180, *2 (8th Cir.2005). “In the event that- a genuine dispute exists concerning predicate facts material to the qualified immunity issue, the defendant is not entitled to summary judgment on that ground.” Pace, 201 F.3d at 1056.
“[Pjublic officials are permitted to claim on appeal that their actions were objectively reasonable in light of their knowledge at the time of the incident.” Mueller v. Tinkham, 162 F.3d 999, 1002 (8th Cir.1998); see also Lyles v. City of Barling, 181 F.3d 914, 917 (8th Cir.1999) (“A law enforcement officer is entitled to qualified immunity from suit for actions that are objectively reasonable in light of clearly established law and the facts known by the officer at the time of his [or her] actions”). “[W]e will affirm the denial of a qualified immunity claim if there exists a genuine issue of material fact concerning the officers’ knowledge or if the moving party is not entitled to judgment as a matter of law.” Lyles, 181 F.3d at 917; accord Vaughn v. Ruoff, 253 F.3d 1124, 1127 (8th Cir.2001). Thus, though we assess the reasonableness of the officers’ actions from an objective standpoint, we do so taking into account the “specific context of the case,” including the officers’ knowledge. Saucier, 533 U.S. at 201, 121 S.Ct. 2151.
I believe that, in this case, there is an issue of material fact as to the predicate facts surrounding qualified immunity, namely, what the officers on the scene knew when seizing the horses. It is undisputed that a veterinarian on the scene recommended removal of all the horses. (Affidavit of Dr. Kim D. Houlding, DVM, at Jt.App. 17. (“Twenty-three horses were identified as being deprived of care consistent with customary animal husbandry practices, -and deprived of necessary sustenance. Accordingly, I recommended to Story County Animal Control that 23 horses be rescued from the premises.”).) The majority states that this fact alone dictates the officers are entitled to qualified immunity. I respectfully disagree because the details of the exchange are unknown.
The search warrant allowed for removal of horses that were “sick and in immediate need of critical care.” (Search warrant, Jt.App. 60) The warrant described these horses as “either exhibiting signs of a disease known as the “strangles” ... or ... weak and malnourished.” Id. So, for a horse to be legally seized, it needed to be (1) “sick and in immediate need of critical care” and (2) either (a) exhibiting signs of the “strangles” or (b) weak and malnourished. Id. (emphasis added). If the defendants had shown Dr. Houlding had *521 stated that all the horses were weak, malnourished, and in immediate need of critical care, or alternatively that all the horses were showing signs of the strangles and were sick and in immediate need of critical care, and therefore that they should be seized, I would join in the majority’s grant of qualified immunity. Under those circumstances,! agree with the majority that “it was imminently reasonable for the Officers to rely upon the professional opinion[ ] of Dr. Houlding ... in determining which horses to seize.” (Majority Opinion at 516.) Under such circumstances, it would not be clear to a reasonable officer that his or her behavior was unlawful, even if some of the seized horses were healthy, and the officer would be entitled to qualified immunity.
However, the defendants have not made that showing in this case. Instead, we have a statement from Dr. Houlding that the horses “were identified” (the passive voice making it unclear whether she was the one doing the identification) “as being deprived of care consistent with customary animal husbandry practices, and deprived of necessary sustenance.” It was for this reason that Dr. Houlding recommended their removal, according to her statement. Even assuming that Dr. Houlding and not some other individual identified the horses as such, her description of the horses during execution of the warrant does not match the description in the warrant. It is possible that Dr. Houlding knew the scope of the warrant and told the officers on the scene that the horses all fit the terms of the warrant, but this is not shown by the evidence before us. Instead, the evidence shows that the veterinarian on the scene found the horses were deprived of “necessary substenance” and “care consistent with customary animal husbandry practices.” In my view, this observation is not close enough to the terms of the warrant for the officers to reasonably rely on it in seizing all the horses. I agree with the majority that the officers could reasonably rely on a recommendation that did not match the warrant language verbatim. However, this is not a case in which the expert used slightly different terms but in essence made the observation required for seizure. This is a case in which the veterinarian found a sub-standard quality of care and not enough food available, when the warrant required the horses be (1) sick and in immediate need of critical care and (2) either (a) showing signs of the strangles or (b) weak and malnourished.[6]
Thus, I believe there is a question of material fact as to what the officers knew on the scene, that is, what Dr. Houlding told them about the horses and how this matched up with the terms of the warrant. Adding to the uncertainty are facts that suggest that the officers knew the horses were healthy, but seized them anyway, perhaps because McClendon had moved some of her horses before their arrival.[7] *522 McCaskey testified that they “loaded them up because we didn’t want any more animals disappearing.” (McCaskey testimony, First Supp. Jt.App. at p. 217.) She also testified that “for the protection of the horses and because the others had been moved, we removed them.” (McCaskey testimony, Jt.App. at 144 (emphasis added).) In addition, the video footage submitted shows an exchange between McClendon and one of the officers during the execution of the search warrant. McClendon says that the Notice stated that only the sick horses would be seized and the officer replies, “We were going to take the ones showing signs of disease, but the ones showing the greatest signs of disease have disappeared.”
As stated above, “we will affirm the denial of a qualified immunity claim if there exists a genuine issue of material fact concerning the officers’ knowledge.” Lyles, 181 F.3d at 917. I believe these facts, taken in the light most favorable to McClendon, are sufficient to leave a genuine issue of material fact as to the knowledge the officers had on the scene. This precludes a finding of summary judgment at this stage.
I would affirm the district court’s denial of qualified immunity as to McCaskey and Rogers. I would also affirm the dismissal of the other defendants.

. As support for its finding that all the horses were properly seized, the majority offers the statement of Dr. Houlding that "all the animals should be removed until proper arrangements can be made for their care or sale.” (Majority Opinion at 516-517.) I would find that this statement is of no help to the defendants’ case because this statement appears in a letter written by Dr. Houlding and attached to the warrant application. The court that drafted the description of the horses to be seized had Dr. Houlding’s recommendation before it, and it chose not to simply empower the officers to rescue all of the horses, but instead only to rescue horses in a particular condition. This shows that Dr. Houlding had the opinion that all horses should be seized even before the warrant was issued and before its terms were set, not that she believed they all fit the terms of the warrant.

. This fact dispute also raises the issue of willfulness. We note that willful violations of law are not subject to qualified immunity protection. "Qualified immunity protects 'all *522 but the plainly incompetent or those who knowingly violate the law.’" Saucier, 533 U.S. at 202, 121 S.Ct. 2151 (quoting Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)) (emphasis added).